**In the Matter of William and Linda BUCKLAND, Debtors.**

**William and Linda BUCKLAND, Plaintiffs,**

**v.**

**HOUSEHOLD REALTY CORPORATION and Paul D. Gilbert, Trustee, Defendants.**

**Bankruptcy No. 3–90–00473.**
**Contested Matter Adv. No. 3–90–0135.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Jan. 14, 1991.

Stephen D. Miles, Dayton, Ohio, for creditor.

Edward M. Smith, Dayton, Ohio, for debtors.

Paul D. Gilbert, Dayton, Ohio, trustee.

DECISION ON ORDER FIXING VALUATION OF ALLOWED SECURED CLAIM AND PARTIALLY AVOIDING LIEN

THOMAS F. WALDRON, Bankruptcy Judge.

This adversary proceeding, which involves the chapter 7 debtors' complaint to determine the amount of a second mortgage holder's secured claim and to avoid the unsecured portion of that claim, arises under 28 U.S.C. § 1334(b) in a case referred to this court by the Standing Order Of Reference entered in this district on July 30, 1984, and is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).

The plaintiffs are the debtors in a voluntary chapter 7 bankruptcy filed on February 5, 1990. The primary defendant is Household Realty Corporation (Household), which holds a second mortgage on the debt-

ors' real property. The Chapter 7 Trustee is named as a defendant; however, no relief was sought against the trustee, nor has he participated in this proceeding. Therefore, the debtors' complaint against the trustee is dismissed.

The debtors' complaint against Household (Doc. 1) alleges that, as of the date this bankruptcy was filed, their real property had a value which was less than the balance due on the first mortgage, and, as a result, Household, did not have an allowed secured claim (11 U.S.C. § 506(a)) and its second mortgage could be entirely avoided (11 U.S.C. § 506(d)). Household argues that the value of the debtors' property, as of the date this bankruptcy was filed, was greater than the total of the first mortgage and Household's second mortgage and, as a result, Household had a fully secured claim and was entitled to interest, fees, and charges provided for under the agreement (11 U.S.C. § 506(b)).

Following a trial in this proceeding, the court granted the parties additional time to file written memoranda. The parties filed a Post Trial Memorandum Of Defendant Household Realty Corporation (Doc. 30) and Plaintiffs' Post Trial Memorandum (Doc. 31).

The initial inquiry in this proceeding is whether the provisions of 11 U.S.C. § 506 authorize a chapter 7 debtor to bifurcate a secured creditor's claim and avoid any lien on the unsecured claim. This issue continues to create contrary conclusions in courts throughout the country. A listing of many of these decisions appears in Judge William H. Brown's well analyzed decision, *In re Zobenica*, 109 B.R. 814 (Bankr.W.D.Tenn. 1990). That decision notes:

> It is well settled that the effect of § 506(a) is to bifurcate "a secured creditor's claim into a secured and unsecured component, with the claim secured to the extent that the creditor may look to the underlying collateral." *Gaglia v. First Federal Savings & Loan Association. et al.*, 889 F.2d 1304, 1306 (3rd Cir.1989). According to the United States Supreme Court,

Subsection (a) of § 506 provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured. (ftn. 3) *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989).

Given this rule, the majority of courts considering the instant issue have concluded that § 506(d) may be used to avoid the unsecured portion of a lien deemed unsecured by the effect of § 506(a). Moreover, this majority conclusion has been reached in the Chapter 7 context in reliance primarily on the plain meaning of the statute. *See, e.g., Gaglia v. First Federal Savings & Loan Association, supra; In re Lindsey*, 823 F.2d 189 (7th Cir.1987); *In re Folendore*, 862 F.2d 1537 (11th Cir.1989); *In re Garnett*, 88 B.R. 123 (Bankr.W.D.Ky.1988) *aff'd*, 99 B.R. 757 (W.D.Ky.1989); *In re Zlogar*, 101 B.R. 1 (Bankr.N.D.Ill.1989); *In re O'Leary*, 75 B.R. 881 (Bankr.D.Or. 1987); *In re Worrell*, 67 B.R. 16 (Bankr. C.D.Ill.1986); *In re Cleveringa*, 52 B.R. 56 (Bankr.N.D.Iowa 1985); *In re Lyons*, 46 B.R. 604 (Bankr.N.D.Ill.1985); *In re Hunter*, 101 B.R. 294 (Bankr.S.D.Ala. 1989); *In re Gibbs*, 44 B.R. 475 (Bankr.D. Minn.1984); *In re Brace*, 33 B.R. 91 (Bankr.S.D.Ohio 1983); *In re Tanner*, 14 B.R. 933 (Bankr.W.D.Pa.1981).

Contrasting this majority view is a strong minority which suggests that "there are persuasive arguments on both sides of the issue." *In re Zlogar*, 101 B.R. at 5. The *Zlogar* Court summarized the minority views as holding that § 506 should not be available to a Chapter 7 debtor because: "(a) real property is not included in § 722; (b) this practice would create bad policy by discouraging reorganization; and (c) this would permit unconstitutional takings of property." 101 B.R. at 4. *See also* minority rationale summarized 101 B.R. at 5. *See, e.g., In re Dewsnup*, 87 B.R. 676 (Bankr.D.Utah 1988); *In re Maitland*, 61 B.R. 130 (Bankr.E.D.Va.1986); *In re Smith*, 79 B.R. 650 (Bankr.D.Md.1987); *In re Larson*, 99 B.R. 1 (Bankr.D.Alaska 1989); *In*

re Hoyt, 93 B.R. 540 (Bankr.S.D.Iowa 1988); In re Mahaner, 34 B.R. 308 (Bankr.W.D.N.Y 1983).

[3] Thus, a $100,000 claim secured by a lien on property of a value of $60,000.00 is considered to be a secured claim to the extent of $60,000.00 and to be an unsecured claim for $40,000.00. See 3 Collier on Bankruptcy para. 506.04, p. 506–15 (15th Ed.1988) ("section 506(a) requires a bifurcation of a 'partially secured' or 'undersecured' claim into separate and independent secured claim and unsecured claim components.")

In re Zobenica, 109 B.R. at 817; but see In re Lange, 120 B.R. 132 (9th Cir. BAP 1990).

■ This court begins its analysis of § 506 by noting that 11 U.S.C. § 103(a) provides, "[e]xcept as provided in § 1161 [railroad reorganizations] of this title, chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title." Although this citation may seem unnecessarily elementary, it clearly establishes that the provisions of 11 U.S.C. § 506 are applicable in chapter 7 proceedings.

■ Having determined that § 506 is applicable to chapter 7 proceedings, the court notes that consideration of 11 U.S.C. § 541 is also necessary to the resolution of the issues in this proceeding. Section 541(a)(1) defines what property is included in the estate, and has been broadly construed. As the Fourth Circuit noted:

Under 11 U.S.C. § 541(a), a bankruptcy estate includes, with minor exceptions not relevant here, "all legal or equitable interest of the debtor in property as of the commencement of the case." "This includes all exempt property." Shirkey v. Leake, 715 F.2d [859] at 863 [ (4th Cir.1983) ]. The legislative history of this statute is explicit in that: "The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in section 70(a) of the Bankruptcy Act...." Leg.Hist. at 5868, 6323. It "includes as property of the estate all property of the debtor, even that needed for a fresh start." Id.

Tignor v. Parkinson, 729 F.2d 977, 980 (4th Cir.1984) (emphasis added); Accord Matter of Osburn, 56 B.R. 867, 872 (Bankr. S.D.Ohio 1986). As stated in Tignor, property of the estate includes that which is necessary for a fresh start. This equitable concept of a fresh start is aided by the provisions of 11 U.S.C. § 506.

The provisions of 11 U.S.C. § 506 foster two significant purposes of bankruptcy legislation—an equitable distribution of estate assets among claimants pursuant to congressionally mandated priorities and a fresh start for a debtor free from the encumbrance of preexisting debt. The provisions of § 506 further these two purposes by ignoring the mere labeling of a claim as secured, and stressing that a claim is only secured to the extent of the value of the collateral on which the claimant's lien is fixed. In a chapter 7 case, these provisions permit the trustee, or the debtor, to provide for the appropriate payment of all components of an allowed secured claim and, to the extent funds are available from the estate, or the debtor has not discharged the claim, to allow for the payment of an unsecured claim. As the Supreme Court noted:

The phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral." H.R.Rep. No. 95–595, pp. 181, 356 (1977); see also S.Rep. No. 95–989, p. 68 (1978).... Section 506(b) provides that "[t]o the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim." (Emphasis added). Since this provision permits postpetition interest to be paid only out of the "security cushion," the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest. See 11 U.S.C. § 502(b)(2).... "To allow a secured creditor interest where his security was worth less than the value of his debt was thought to be inequitable to unsecured creditors." Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 164, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946). It was considered unfair to allow an undersecured creditor to recover interest from the estate's unencumbered

assets before unsecured creditors had recovered any principal. *See Id.,* at 164, 166, 67 S.Ct. at 240, 241; *Ticonic Nat. Bank v. Sprague,* 303 U.S. 406, 412, 58 S.Ct. 612, 615, 82 L.Ed. 926 (1938). *United Sav. Ass'n. v. Timbers Of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988).

Consistent with the foregoing analysis, including the specific provisions of 11 U.S.C. § 103(a), § 541(a), and § 506(a) and (d), and two significant purposes of bankruptcy legislation, this court concludes that a chapter 7 debtor may bifurcate a secured creditor's claim and avoid any lien on the unsecured claim. *In re Zobenica,* 109 B.R. at 817–820.

■ Having reached a determination concerning this legal issue, the court turns to an examination of the evidence presented in this proceeding.

The debtors' valuation of the property is forty-five thousand dollars ($45,000.00) and Household's valuation is sixty-two thousand, five hundred dollars ($62,500.00). Although this court recognizes that appraisal testimony is opinion evidence and, accordingly, frequently produces different conclusions concerning the fair market value of a particular piece of property, a difference of seventeen thousand, five hundred dollars ($17,500.00) on an existing piece of residential real estate with a high value of sixty-two thousand, five hundred dollars ($62,500.00) and a low value of forty-five thousand dollars ($45,000.00) represents, in this court's experience, an unusual disparity.

In this proceeding, the debtors presented as their expert appraiser, Robert W. Skilman, who submitted a letter appraisal (plaintiff's Exhibit 5). Mr. Skilman has been in the real estate business for over forty years and has been an independent appraiser. for thirty-five of those years. He has performed appraisal services for, among others, the State of Ohio, the City of Dayton, the City of Moraine, and the City of Kettering, and has performed mortgage loan appraisal services for a multitude of insurance companies, banks, and savings and loans. He is an approved appraiser for the Montgomery County Common Pleas Probate Court and the Montgomery County Sheriff's Office, and has previously qualified as an expert witness in the Montgomery County Common Pleas Court, the United States Tax Court, and the United States Bankruptcy Court. Mr. Skilman submitted a listing of his qualifications (plaintiff's Exhibit 7).

Household presented as its expert witness, James L. Denney, who filed an appraisal report (defendant's Exhibit B). Mr. Denney has been in the real estate business for seven years and has been an appraiser for the last five of those years. Mr. Denney was employed by Household Finance Corporation for the period spanning from 1961 through 1984 and was, for the last thirteen of those years, a district manager actively involved in appraisal work performed for Household Finance Corporation. The majority of Mr. Denney's present appraisal work is performed on behalf of Household Finance Corporation or its affiliates. Mr. Denney submitted a listing of his qualifications (defendant's Exhibit A).

In addition to the testimony presented by the appraisers, the debtor also testified. The court also received plaintiff's Exhibit 6, which is a copy of the Jefferson Township Auditor's records for the first half of 1989, which lists the debtors' property as having a tax value consisting of land—$4,620.00, and improvements—$9,980.00, for a total of $14,600.00. The court also received defendant's Exhibit C, which consists of sheets from the Pace Street Trend—Single Family Resales, Zip Code Summary for the twelve months ending September 30, 1989, Municipality Summary for the twelve months ending September 30, 1989, and comparative statistics for the twelve months ending September 30, 1990, change from 1989—change from 1988. In addition, the court received defendant's Exhibit D, an appraisal report of the debtors' property dated September 14, 1988, prepared by Earl Mackwaine, since deceased, and signed by J.L. Denney as the review appraiser.

The most striking difference between the reports submitted by the appraisers (plain-

tiff's Exhibit 5, defendant's Exhibit B) is the detailed nature of Household's report. The plaintiff's report consists of a single page in the form of a letter to counsel for the debtors. Household's exhibit consists of a two page Uniform Residential Appraisal Report, Freddie Mac Form 70, 10/86, Fannie Mae Form 1004, 10/86, which contains three comparables, an attached sales comparison analysis sheet containing an additional three comparables, an additional single page addendum, three pages of photographs of the debtors' property and the six comparables, and two attached sheets showing the location and boundaries of the debtors' property and its location in relationship to the six comparables.

The debtors' appraiser testified that he examined comparable sales in the area, consulted appropriate courthouse records, and examined multiple listing information; however, as a result of the fee he was paid for his report and appearance, he did not include a more detailed report, nor did he make or keep extensive notes in connection with this appraisal. It is noted that during cross-examination of the debtors' appraiser, he conceded that, to the extent he had made any notes in arriving at this appraisal, he no longer had these notes; or, if he still had the notes, he did not have them with him and was unable to independently recall any specific comparable sales he used in reaching his opinion. He repeatedly testified that if he had made extensive notes and attached further documentation to his report, it would not have significantly altered his opinion.

Although the court recognizes that this is a chapter 7 bankruptcy proceeding, which by its nature involves debtors with limited financial resources, the absence of substantiation for opinion evidence is often a factor adversely affecting the weight to be given the opinion.

The debtors' appraiser repeatedly testified that, in his opinion, the debtors had simply paid too much for the property and that the property was in such poor condition that it was presently unmarketable. He noted that the property was built in 1923 and that its quality did not meet to-day's standards. Specifically, he noted that there was a detached garage in extremely poor condition, which had little value, along with a frame barn that was in poor condition and had little value. He did note that there was a metal barn, also referred to in this proceeding as a pole barn, which was in good condition; however, his opinion was that it was an "over improvement" on this particular property which added little value. Further, he stated that there was an above ground pool in questionable condition that had little value. He concluded that, considering the age of the property, its poor condition, inside and outside, the poor condition of the garage, the frame barn and the above ground pool, and the need for extensive repairs in the eight to ten thousand dollar range, the property was a poor prospect for any sale, and, in his opinion, the fair-market value of the property at the time the debtors filed bankruptcy was forty-five thousand dollars ($45,000.00).

The debtor also testified concerning the fair market value of the real estate. Fed. R.Evid. 701; *In re Damron*, 8 B.R. 323, 325 (Bank.S.D.Ohio 1980); *In re Jamison*, 93 B.R. 595, 596 (Bankr.S.D.Ohio 1988). He stated that, at the time he bought the property, the arrangement of certain furnishings of the previous owner prevented the debtor from completely inspecting the property. He testified that since purchasing the property, he discovered that the roof leaks and, even though he has had it patched, it continues to leak. He testified that bricks are loose in the chimney, and a big hole exists in the chimney which needs cement. He further testified that the wiring throughout the house is in bad condition and that fire comes out of some of the sockets. As an example, he stated that fuses blow if both the washer and dryer are in use. He noted that he had been rejected for insurance coverage as a result of faulty wiring. He testified that the garage is so small that you could not fit a Volkswagen automobile in it, and that the garage is really a workshop. He testified that the wooden frame barn has leaks and holes in the side of the building where the wind blows through. He testified that the

metal barn also has leaks. He testified that the swimming pool needs a new filter system. He testified that the plumbing throughout the house is in poor condition because the plumbing lines are clogged with lime. He stated that the bathroom on the second floor has leaked into the dining room below and that the bathroom floors and the living room walls remain in need of repair. He testified that the basement has leaks and that the walls in the kitchen are in need of repair. He testified that he has previously repaired and attempted to correct some of these problems. He testified that he looked into the cost of obtaining the materials necessary for some of these repairs and discussed these repairs with other people who might assist him. He concluded that to take the steps necessary to repair the various problems, even if he did the work himself, it would cost approximately twenty thousand dollars ($20,-000.00). He stated, however, that since this house was his most significant asset, he wanted to remain in the property and was currently making the mortgage payments to the first mortgage holder.

Household's appraiser conceded that the general condition of the property was poor and that there were required repairs; however, his opinion was that, with repairs in the three to five thousand dollar range, the property could be cleaned up and made marketable. He also noted that from the comparables he examined, similar properties sold for prices above sixty thousand dollars ($60,000.00). He also noted that the debtors had purchased this property for sixty thousand dollars ($60,000.00) only four years ago. He disagreed with the debtors' appraiser and assigned a value of six thousand dollars ($6,000.00) to the metal pole barn, although he assigned a minimal value to the pool, the garage and the frame barn. The defendant's appraiser further testified that the exterior and interior of the house were not in bad shape. He testified that the roof was not in an obviously bad condition, the plumbing was not in an obviously bad condition, the chimney was not in an obviously bad condition, and a breaker box could be installed for less than five hundred dollars ($500.00) to

improve electrical service. He did acknowledge that the only bathroom in the house, which was located on the second floor, demonstrated evidence of leaking and that after the floor in the bathroom was replaced, it was not retiled.

As this court noted in the *Matter of Turner*, Case No. 3–88–0153 (Bankr.S.D. Ohio Dec. 30, 1988), an unpublished decision:

> Turning then to the determination of the fair-market value of the debtors' property, the court notes that "the market data approach is generally recognized as the best method at arriving at the fair-market value of land", and this court is most persuaded by this comparative data approach. *In re Chaney*, 87 B.R. 131, 133 (Bankr.D.Mont.1988).

This recognition of the weight to be given the market data approach does not result in the automatic acceptance of any specific appraiser's conclusion arrived at as a result of using the market data approach. Although the market data approach generally provides the most reliable evidence of the fair-market value of a particular property, as this court previously noted, the disparity in the appraisers' conclusions concerning the value this existing residential real estate indicates that this is not a typical piece of property.

In examining the valuations given to the debtors' property, the court notes that valuation is ultimately the opinion of a particular appraiser and, as such, the weight to be accorded the opinion rests upon a number of factors frequently used by courts in evaluating appraisal testimony. A nonexclusive listing of these factors includes: the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented.

As with most expert testimony, although it is essential that the appraiser demonstrate the basis for the opinion, in general, no single factor will guarantee that the court will be persuaded to fully accept the

expert's conclusion. As a result, the mere presentation of multiple items of evidence (photographs, surveys, projections, comparable sales, prior transfer records, sales trends) may or may not be ultimately persuasive in determining the weight to be accorded a particular opinion. This court is more likely to be persuaded, not by any individual item, or even by a combination of individual items, but by the consistency of the appraiser's conclusions measured against all of the admissible evidence bearing on the issue considered in the light of the direct and cross-examinations conducted in the proceeding. While such a position fails to provide a bright-line standard, it is, in this court's opinion, most consistent with a trial court's obligation to filter and evaluate, from all the evidence offered, the admitted evidence which most persuasively focuses on the ultimate issue of valuation.

While it is undisputed that the six comparables listed by the defendant's appraiser all sold in the sixty thousand dollar ($60,-000.00) or greater range, all of these properties were built in 1940 or thereafter, and not in 1923. Further, and more significantly, the evidence establishes that the debtors' property is presently in such poor condition that, without repairs and improvements, it is virtually unmarketable. Although the defendant's appraiser suggested that three to five thousand dollars ($5,000.00) would place this property in a marketable condition, and that such repairs and improvements could yield a dollar for dollar increase in the value of the property, the court is unable to agree with this conclusion. The court is persuaded not only by the debtors' appraiser, but also by the debtors' testimony that the debtors' home and related structures are in such poor condition that a realistic recognition of the existing condition of this property requires a conclusion that its value is substantially less than the sixty thousand dollars ($60,-000.00) the debtor paid for the property approximately four years ago. The court is persuaded that the debtors' appraiser's evaluation and the debtor's testimony are more accurate on these issues than the defendant's appraiser's testimony.

Although the court finds the testimony of the debtors' appraiser and the debtor to be persuasive, it does not find this testimony to be fully conclusive on the issue of valuation. The court finds that the valuation of forty-five thousand dollars ($45,-000.00) does not adequately reflect the value of the metal barn. Therefore, the court concludes that the forty-five thousand dollar ($45,000.00) figure should be increased by the sum of three thousand dollars ($3,000.00).

Accordingly, the court finds that the fair-market value of the debtors' real estate as of the date this bankruptcy was filed, is in the amount of forty-eight thousand dollars ($48,000.00) and that the debtors' property has not increased in value since that date. At the start of this proceeding the parties stipulated that the balance due on the first mortgage as of the date this bankruptcy was filed was forty-six thousand, three hundred and eighty-two dollars and twenty-seven cents ($46,382.27). Therefore, the court finds that the value of the defendant's secured claim is in the amount of one thousand, one hundred and seventeen dollars and seventy-three cents ($1,117.73). The balance of the debtors' claim is unsecured.

Although the parties presented evidence and arguments on the total amount due Household, because the trustee filed a Report Of Trustee In No Asset Case (Doc. 12, Case No. 3–90–00473), which results in no distribution on any unsecured claim, the court concludes that there is no reason to determine the remaining balance due Household on the unsecured portion of its claim.

Consistent with the holding in *In re Zobenica*, 109 B.R. at 821, this court recognizes that no existing Bankruptcy Code provision or case law permits the debtors to restructure a monthly payment on this secured claim; rather, the debtors are required to pay this secured claim in full.

Accordingly, the court partially GRANTS the debtors' Complaint For Valuation And Avoidance Of Lien and determines that the value of the debtors' property as of the date the bankruptcy was filed is forty-eight

thousand dollars ($48,000.00) and that the value of Household Realty Corporation's lien as of the date this bankruptcy was filed is one thousand, one hundred and seventeen dollars and seventy-three cents ($1,117.73) and that the balance of Household Realty Corporation's claim is unsecured. The debtors shall pay to Household Realty Corporation the sum of one thousand, one hundred and seventeen dollars and seventy-three cents ($1,117.73) not later than thirty (30) days following the entry of the order in accordance with this decision; and, if the debtors pay the above amount to Household Realty Corporation, Household Realty Corporation shall cancel any outstanding lien on the debtors' property.

If the debtors fail to pay Household Realty Corporation the sum of one thousand, one hundred and seventeen dollars and seventy-three cents ($1,117.73) not later than thirty (30) days following the entry of the order in accordance with this decision, Household Realty Corporation may commence foreclosure proceedings against the real estate without further order from this court.

An order in accordance with this decision is simultaneously entered.

SO ORDERED.