ELECTRONIC CITATION:  2012 FED App. 0008P (6th Cir.)
File Name:  2012b0008p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re:  CREEKSIDE SENIOR APARTMENTS, LP, *et al.*, | ) ) ) ) ) | |
| Debtors. | | No. 11-8072 |
| _____ | ) | |

Appeal from the United States Bankruptcy Court
for the Eastern District of Kentucky
Case No. 10-53019

Argued: April 23, 2012

Decided and Filed: June 29, 2012

Before: HARRIS, PRESTON, and SHEA-STONUM, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED**: Robert D. Gordon, CLARK HILL PLC, Birmingham, Michigan, for Appellants.  Daniel E. Hitchcock, WYATT, TARRANT, & COMBS, LLP, Lexington, Kentucky, for Appellee.  **ON BRIEF**: Robert D. Gordon, John R. Stevenson, CLARK HILL PLC, Birmingham, Michigan, Ellen Arvin Kennedy, DINSMORE & SHOHL LLP, Lexington, Kentucky, for Appellants.  Daniel E. Hitchcock, WYATT, TARRANT, & COMBS, LLP, Lexington, Kentucky, for Appellee.

_____

**OPINION**
_____

ARTHUR I. HARRIS, Bankruptcy Appellate Panel Judge.  This appeal arises from a bankruptcy court order in which the bankruptcy court concluded that, for purposes of determining the value of the secured portion of the claims of Bank of America, N.A. ("Bank") pursuant to

11 U.S.C. § 506(a), a determination of the fair market value of various apartment complexes included consideration of the remaining federal low-income housing tax credits. In determining the value of the real property, the bankruptcy court also concluded that various rates and/or figures used by the Bank's appraiser were more accurate.

The five Kentucky limited partnership debtors in the five jointly-administered Chapter 11 cases (collectively "Debtors") and their general partners (collectively "General Partners") challenge the bankruptcy court's valuation of the real property. In connection therewith, they also take issue with the bankruptcy court's order overruling (1) the Debtors' objection to the valuation of low-income housing tax credits in the Bank's appraisals ("Valuation Objection") and (2) the Debtors' motion *in limine* to exclude certain portions of expert reports, affidavit, and testimony of the Bank's expert witness ("Motion *In Limine*").

For the reasons that follow, we affirm the bankruptcy court's orders setting the market value of the Debtors' low-income housing tax credit properties ("LIHTC properties") and overruling the Debtors' and the General Partners' Valuation Objection and Motion *In Limine*.

## I.    ISSUES ON APPEAL

The main issue presented by this appeal is whether the bankruptcy court erred in including the purported value of the remaining low-income housing tax credits when valuing the Bank's secured interest in the Debtors' real properties under § 506(a) of the Bankruptcy Code. The Debtors and their General Partners have also alleged that the bankruptcy court made several errors in weighing the evidence at the valuation hearing and in denying their Motion *In Limine* to exclude certain portions of the Bank's appraisals.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Eastern District of Kentucky has authorized appeals to the Panel, and no party has timely elected to have this appeal heard by the district court. 28 U.S.C. § 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and

leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted).

An order determining the value of property pursuant to 11 U.S.C. § 506(a) is a final order for purposes of appeal if the valuation was made for purposes of plan confirmation. *Chase Manhattan Mortg. Corp. v. Rodriguez* (*In re Rodriguez*), 272 B.R. 54, 56 (D. Conn. 2002); *see also Gen. Electric Credit Equities, Inc. v. Brice Rd. Devs., L.L.C.* (*In re Brice Rd. Devs., L.L.C.*), 392 B.R. 274, 282 n.4 (B.A.P. 6th Cir. 2008). Because the bankruptcy court made its valuation "for use in connection with the plan, disclosure statement, and confirmation process," the valuation order is a final order. (Order Setting Market Value of Debtors' Low-Income Housing Tax Credit Properties at 1, Bankr. Case No. 10-53019, ECF No. 252.)

A determination of value pursuant to 11 U.S.C. § 506(a) presents a mixed question of law and fact. *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship* (*In re Matter of T-H New Orleans Ltd. P'ship*), 116 F.3d 790, 799 (5th Cir. 1997). The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard. *Riverview Trenton R.R. Co. v. DSC, Ltd.* (*In re DSC, Ltd.*), 486 F.3d 940, 944 (6th Cir. 2007). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985)). The bankruptcy court's legal conclusions are reviewed *de novo*. *Solis v. Laurelbrook Sanitarium and School, Inc.*, 642 F.3d 518, 522 (6th Cir. 2011). "De novo means that the appellate court determines the law independently of the trial court's determination." *Treinish v. Norwest Bank Minn., N.A.* (*In re Periandri*), 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001) (citations omitted).

As the trier of fact, a bankruptcy " 'court's rulings on evidentiary matters will only be reversed on a clear showing of abuse of discretion.' " *Phillips Petroleum Co. v. Stokes Oil Co., Inc.*, 863 F.2d 1250, 1257 (6th Cir. 1988) (citing *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1218 (6th Cir. 1987)). This standard applies to denials of motions *in limine*, *United States v. Poulsen*, 655 F.3d 492, 508 (6th Cir. 2011), as well as to determinations regarding the weight particular evidence should be given. *United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993).

## III.  FACTS

This appeal arises from an order dated September 12, 2011, setting the market value of Debtors' low-income housing tax credit properties ("Valuation Order"), entered in five jointly-administered Chapter 11 cases in the Eastern District of Kentucky:

| 10-53019 | In re Creekside Senior Apartments, Limited Partnership |
| 10-53298 | In re Nicholasville Greens, Limited Partnership |
| 10-53300 | In re Franklin Place Senior Apartments, Limited Partnership |
| 10-53301 | In re Pennyrile Senior Apartments, Limited Partnership |
| 10-53346 | In re Park Row Senior Apartments, Limited Partnership |

A.    *Background of the Debtors*

The Debtors are five single-asset real estate debtors as defined in 11 U.S.C. § 101(51B). Each of the Debtors is a Kentucky limited partnership with a corresponding general partner, an administrative limited partner, and an investor limited partner.  By virtue of the partnership agreements, the General Partners hold .01% of the corresponding limited partnership's equity interests, the administrative limited partners hold .01% of the corresponding limited partnership's equity interests, and the investor limited partners hold the remaining 99.98% of the corresponding limited partnership's equity interests.  Each of the Debtors owns a parcel of real property on which it operates a low-incoming housing apartment complex.

To finance the acquisition and construction/rehabilitation of each property, the Debtors obtained construction loan financing from the Bank.  Each construction loan automatically converted into permanent financing upon various terms and conditions.  Pursuant to the agreements, the Bank loaned the Debtors the following total amounts of money:

| | |
|---|---|
| Creekside Senior Apartments, LP: | $1,390,000.00 |
| Nicholasville Greens, LP: | $760,234.35 |
| Franklin Place, LP: | $793,345.29 |
| Pennyrile Senior Apartments, LP: | $534,242.63 |
| Park Row Senior Apartments, LP: | $1,034,222.00 |

As security for these loans, the Bank took a first mortgage lien upon the Debtors' real properties. All five notes matured prior to the filing of the Debtors' bankruptcy cases.

Each of the Debtors' real property complexes was developed in conjunction with the federal Low-Income Housing Tax Credit Program enacted by Congress in 1986 to encourage private market investment in low-income housing. *See* 26 U.S.C. § 42. In exchange for agreeing to rent restrictions, the owners or investors in the property get a dollar-for-dollar credit against their federal income tax obligations over a period of 10 years, provided that the property remains in compliance with the low-income housing tax credit program requirements. The Treasury Department administers the program while state agencies distribute the credits on a competitive basis.

B.      *The Land Use Restriction Agreements*

In 2008, each of the Debtors entered into a land use restriction agreement ("LURA") with the Kentucky Housing Corporation ("KHC"), the agency tasked with administering the federal low-income housing tax credit program for the Commonwealth of Kentucky. The Debtors, and not their General Partners, administrative limited partners, or investor limited partners, entered into these LURAs as the owners of the properties. The LURAs entered into between the Debtors and the KHC in these cases provide that the restrictions set forth therein are covenants running with the land:

> Owner intends, declares and covenants, on behalf of itself and all future owners and operators of the Project during the term of this Agreement, that this Agreement and the covenants and restrictions set forth in this Agreement regulating and restricting the use, occupancy and transfer of the Project (i) shall be and are covenants running with the Project, encumbering the Project for the term of this Agreement, binding upon Owner's successors in title and all subsequent owners and operators of the Project; (ii) are not merely personal covenants of Owner; . . . .

(LURA § 2(b), Bankr. Case No. 10-53019, ECF Nos. 204-4, 204-8, 204-12, 204-16, and 204-20.) The LURAs further provide:

> (j) Subject to the requirements of Section 42 of the [Internal Revenue] Code and this Agreement, Owner may sell, transfer or exchange the entire Project at any time, but Owner shall notify in writing and obtain the agreement of any buyer or successor or other person acquiring the Project or any interest therein that such acquisition is subject to the requirements of this Agreement and the requirements of Section 42 of the Code and applicable regulations and the KHC Occupancy Restrictions. This provision shall not act to waive any other restriction on sale, transfer or exchange of the Project or any low-income portion of the Project. KHC may void any sale, transfer or exchange of the Project if the buyer or successor or other person fails to

assume in writing the requirements of this Agreement and the requirements of Section 42 of the Code.

(k) Owner will notify KHC in writing of any sale, transfer or exchange of the entire Project or any low-income portion of the Project.

(*Id.* at § 3(j) and (k).)

Subject to limited exceptions not applicable here, the term of each LURA was for an initial compliance period of 15 years and then an additional 15 year extended period. (*Id.* at §§ 5(a) and 6(a).) As the lender for the construction and/or acquisition of the properties, the Bank was a party to each LURA. The sole purpose of making the Bank a party to the LURA was to subordinate the Bank's debt to the restrictions contained within the LURA. All of the properties in this case were put into service in 2004 or 2005, and the tax credits have been used through 2010. As a result, there are 4 to 5 years of remaining tax credits and 24 to 25 years remaining on the rent restrictions.

In accordance with 26 U.S.C. § 42(h)(6), the LURAs entered into between the Debtors and the KHC in this case provide as follows:

> THIS DECLARATION OF LAND USE RESTRICTIVE COVENANTS AND SUBORDINATION AGREEMENT, . . . [is] given by [each Debtor], a Kentucky limited partnership and its successors and assigns ("Owner") . . . as a condition precedent to the allocation of Low Income Housing Tax Credits by KENTUCKY HOUSING CORPORATION . . . .

(LURAs at 1, Bankr. Case No. 10-53019, ECF Nos. 204-4, 204-8, 204-12, 204-16 and 204-20.) Each LURA was recorded in the appropriate county recorder's office.

C.      *The Tax Credit Allocations and Partnership Agreements*

Once the KHC awarded and reserved the tax credits to each of the Debtors' properties, the corresponding investor limited partner "syndicated the investment and tax credits opportunity to a pool of investors. Through the Investor LP, those investors then funded the 'Investor Limited Partner Contribution' in accordance with paragraph 3.4 of each Debtor's Amended and Restated Agreement of Limited Partnership." (Appellant Br. at 4.) All of the investments were made by the

investor limited partners in exchange for 99.98% of the equity ownership in the corresponding Limited Partnership.

With respect to the tax credits, the partnership agreements provide as follows:

> [T]he Partners intend that Housing Tax Credits *shall be allocated* 99.98% to the Investor Limited Partner, 0.01% to the Administrative Limited [Partner] and 0.01% to the General Partner.

(Amended and Restated Partnership Agreements at § 9.1(G)(v)(a), Bankr. Case No. 10-53019, ECF Nos. 214-1 through 214-15) (emphasis added.) In the event of a recapture of certain tax credits, then "Housing Tax Credits shall be recaptured by the Partners who originally claimed said Housing Tax Credits, in proportion to the ratio in which such recaptured Housing Tax Credits were claimed." (*Id.* at § 9.1(G)(v)(b).) Section 6.6 of the Partnership Agreements also provides "[e]xcept for the Apartment Complex, the Housing Tax Credits, and the contractual rights referred to herein, the [Limited] Partnership [aka the Debtor] owns no other property, tangible or intangible, real or personal." (*Id.* at § 6.6(A).)

In the "Low Income Housing Tax Credit Certificate of Carryover Allocation" letters from KHC to the Debtors, KHC identifies the name of the "Taxpayer Receiving Allocations" as "Creekside Senior Apartments, Limited Partnership," "Nicholasville Greens, Limited Partnership," "Franklin Place Senior Apartments, Limited Partnership," "Pennyrile Senior Apartments, Limited Partnership," and "Park Row Senior Apartments, Limited Partnership." (Tax Credit Letters, Bankr. Case No. 10-53019, ECF No. 204-29.)

D.      *The Bankruptcy Cases*

The Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code in September and October 2010. On January 10, 2011, the Bank filed proofs of claim as to each Debtor for the following amounts:

| | |
|---|---|
| 10-53019, Creekside: | $1,272,589.36 |
| 10-53298, Nicholasville Greens: | $714,857.43 |
| 10-53300, Franklin Place: | $863,467.53 |
| 10-53301, Pennyrile: | $466,294.67 |
| 10-53346, Park Row: | $1,037,461.15 |

In each proof of claim, the Bank asserted that its claim was fully secured.

On March 4, 2011, the Debtors and the General Partners filed a motion for a hearing to determine the value of the Bank's secured claims pursuant to 11 U.S.C. § 506(a). The Debtors and the General Partners disputed the Bank's assertion that each claim was fully secured and instead alleged that the claims were substantially undersecured. The Debtors and the General Partners further asserted that a valuation hearing was vital because "[t]he treatment of the secured and unsecured portions of the [Bank's] Claims will be a critical component of the Debtors' and the General Partners' prospective plan." (Mot. for Valuation Hr'g at 5, Bankr. Case No. 10-53019, ECF No. 164.)

The Debtors filed their disclosure statement and plan on March 17, 2011. In Article IV, paragraph 4.1, the plan states that the Bank will have an allowed secured claim "equal to the fair market value of [the Bank's] interest in the Estate's interest in such Debtor's Property as determined by the Court at the Valuation Hearing." (Joint Plan of Reorganization" at ¶ 4.1, Bankr. Case No. 10-53019, ECF No. 170.) Class 3 of the Debtors' plan is comprised solely of the Bank's allowed unsecured deficiency balance. The Debtors proposed to pay the Bank the "full principal amount of each of its Allowed Unsecured Claims" unless the Bank timely elected to be treated in accordance with the "Alternative Unsecured Claim Treatment." (*Id.* at ¶ 4.3.) The Debtors and General Partners filed their First Amended Plan on August 11, 2011, which provided for the same treatment of the Bank's claims as the original plan.

On March 28, 2011, the bankruptcy court granted the Debtors' request to schedule a valuation hearing. The bankruptcy court also set forth various deadlines for identifying expert witnesses, submission of written reports and/or appraisals, filing a list of witnesses, submission of testimony by affidavit, and other various pretrial issues.

E.      *The Valuation Objection and Motion In Limine*

On July 25, 2011, the Debtors and its General Partners filed their Valuation Objection and Motion *In Limine* seeking to exclude portions of expert reports, the affidavit, and related testimony

of the Bank's appraiser, David A. Donan. In their Valuation Objection, the Debtors argued that the valuation of the remaining tax credits in the Bank's appraisals was critically flawed for three reasons. First, the Debtors alleged that the tax credits do not constitute property in which a security interest can be taken and, therefore, the credits are not part of the Bank's collateral or its secured claims. Second, the Debtors asserted that the tax credits were held by the Debtors' limited partners and not by the Debtors so the credits are not property of the Debtors' estates. Last, the Debtors argued that the Bank's loan and security documents failed to create a security interest in the tax credits "and, in fact, explicitly carve the Tax Credits out of the Bank's collateral." (Valuation Obj. at 1, Bankr. Case No. 10-53019, ECF No. 214.)

In its brief on appeal, the Bank states,

> Bank of America has never stated that it does not hold a security interest in the Remaining Tax Credits. Bank of America has continuously maintained that whether it has a security interest in the Remaining Tax Credits themselves is irrelevant, as it holds a perfected security interest in the LIHTC real properties which cannot be separated from the Remaining Tax Credits for purposes of § 506 valuation.

(Appellee Br. at 21, n.5.) A review of the pleadings filed in the bankruptcy court supports the Bank's assertion. Additionally, the mortgage documents provide that the Bank's security interest includes:

> (j) To the extent not expressly prohibited by law or not inconsistent with the terms of the Partnership Agreement, all federal, state, and local tax credits, and other tax benefits related to the Property . . . .

(Construction Phase Mortgage at 3, ¶1.1(j), Bankr. Case No. 10-53019, ECF Nos. 214-16, 214-18, 214-20, 214-22, and 214-24.)

In their Motion *In Limine*, the Debtors argued that the bankruptcy court should exclude those portions of David Donan's reports, affidavit, and related testimony which purport to include the value of the remaining low-income housing tax credits in the value of the Bank's collateral. The Debtors alleged that those portions of Donan's evidence "are not based on sufficient facts and data, are not based on and do not conform to accepted principles and methodologies in the industry, and are therefore not reliable." (Mem. in Support of Mot. *In Limine* at 5, Bankr. Case No. 10-53019, ECF No. 215-1.) The Debtors also alleged that the testimony relating to the value of the remaining tax credits was irrelevant.

In response, the Bank argued that the value of the remaining tax credits was relevant to the valuation of its interest in the Debtors' real properties for several reasons. First, the Bank alleged that 28 U.S.C. § 47(d)(7)(A)(ii) clearly provides that federal low-income housing tax credits cannot be separated from ownership of the LIHTC properties, and that once the property is sold the purchaser obtains the right to claim the remaining tax credits. As a result, the Bank argued the value of the remaining tax credits significantly impacts the price a willing buyer would pay to obtain the LIHTC properties at issue in this case. The Bank also alleged that excluding consideration of the value of the remaining low-income housing tax credits while including consideration of the impact the low-income rent restrictions on the value of the properties would lead to an "absurd result." (Resp. to Obj. and Mot. *In Limine* at 1-2, Bankr. Case No. 10-53019, ECF No. 228.) Finally, the Bank asserted that the Debtors' arguments "incorrectly attempt[] to divert the Court's attention to whether security interests in the Remaining Tax Credits themselves are obtainable, as opposed to the real issue of § 506 valuation of [the Bank's] security interest in the Debtors' LIHTC real property and the impact the Remaining Tax Credits that go with the property have on value." (Mem. of Law in Support of Bank's Resp.to Obj. at 5-6, Bankr. Case No. 10-53019, ECF No. 229.)

On August 15, 2011, the bankruptcy court overruled the Debtors' Valuation Objection and Motion *In Limine* and held that evidence of the remaining tax credits was relevant to the issue of valuation ("*In Limine* Order"). The bankruptcy court also held that the Debtors' arguments really went "to the weight of the evidence, not to its reliability." The bankruptcy court observed that, as the trier of fact, it could determine the proper weight to give the evidence of the value of the remaining tax credits at the valuation hearing. (*Id.*)

In overruling the Debtors' Valuation Objection and Motion *In Limine*, the bankruptcy court stated:

> It is uncontroverted that the Bank holds a first mortgage on each Debtor's LIHTC Property. It is further uncontroverted that each of those parcels of real estate is subject to a Land Use Restriction Agreement ("LURA") entered into between the Debtor entity as "Owner" (not the individual limited partners) and the Kentucky Housing Corporation ("KHC"). It is through the LURA that the Debtor entities became entitled to the Tax Credits and each Debtor's LIHTC Property became subject to the rent restrictions. The limited partners may have become entitled to the allocation of the Tax Credits through the respective partnership agreements, but they did not become the owners of the Tax Credits through those agreements. Both the

rent restrictions and the Tax Credits run with the land. Therefore, if the LIHTC Property is sold prior to the end of the compliance period and there are remaining tax credits, then

> [T]he credit allowable . . . to the taxpayer for any period after such acquisition shall be equal to the amount of credit which would have been allowable . . . for such period to the prior *owner* . . . had such owner not disposed of the building.

26 U.S.C. § 42(d)(7)(A)(ii) (emphasis added). This provision makes it clear that the limited partners do not own the Remaining Tax Credits. Those credits would be transferred to the purchaser of the Debtors' LIHTC Properties. As such, the Remaining Tax Credits as well as the rent restrictions would affect the price any purchaser was willing to pay for the Debtors' LIHTC Properties; and thus, their respective values.

(*In Limine* Order at 4-5 and 8, Bankr. Case No. 10-53019, ECF No. 235.)

F.     *The Valuation Hearing and Bankruptcy Court Determination*

The bankruptcy court conducted the valuation hearing on August 18, 2011. The Debtors' appraiser and the Bank's appraiser both appeared at the hearing.

The Bank's appraisals included a valuation of the respective properties and a separate valuation of the remaining tax credits prepared by its expert witness and appraiser, David A. Donan of Allgeier Company. The values placed on the Debtors' properties by the Bank's appraiser were as follows:

| LIHTC Property | Bank's Real Estate Value | Bank's Tax Credit Value | Bank's Total Value |
|---|---|---|---|
| Creekside Senior Apartments | $890,000 | $350,000 | $1,240,000.00 |
| Nicholasville Greens Townhomes | $495,000 | $160,000 | $655,000.00 |
| Franklin Place Senior Apartments | $535,000 | $445,000 | $980,000.00 |
| Pennyrile Senior Apartments | $575,000 | $755,000 | $1,330,000.00 |
| Park Row Senior Apartments | $825,000 | $865,000 | $1,690,000.00 |

(Valuation Order at 14, Bankr. Case No. 10-53019, ECF No. 252.)

Debtors' appraisals, prepared by its expert witness and appraiser, Brad Weinberg of Novogradac & Company, LLC, were as follows:

| LIHTC Property | Debtors' Total Value |
|---|---|
| Creekside Senior Apartments | $593,000.00 |
| Nicholasville Greens Townhomes | $425,000.00 |
| Franklin Place Senior Apartments | $274,000.00 |
| Pennyrile Senior Apartments | $398,000.00 |
| Park Row Senior Apartments | $750,000.00 |

(Valuation Order at 14, Bankr. Case No. 10-53019, ECF No. 252.) Like the Bank's appraiser, the Debtors' appraiser considered the impact the restricted rents have on the properties' values. (*See* Market Valuations at 3, Bankr. Case No. 10-53019, ECF Nos. 207-1, 207-3, 207-6, 207-8, 207-10.) Despite this similarity, the Debtors' appraisals specifically excluded the valuation of the remaining tax credits because the Debtors "believed, and continue to believe, that the remaining Tax Credits are irrelevant to the valuation of the Bank's secured claims, since the Tax Credits are not part of the Bank's collateral." (Appellant Br. at 7.)

Both appraisers testified that the availability of remaining low-income housing tax credits can affect the value of a piece of property. The Bank's appraiser included the value of the remaining tax credits as a component in his determination of the value of the properties; however, the Debtors' appraiser stated that he did not include any consideration of the remaining tax credits in his appraisal because "under the scope of work my appraisal was of the real property only, that was the collateral for the basis of the bankruptcy and that was defined for me, and I – I completed the appraisal on that basis." (Aug. 18, 2011 Tr. of H'rg at 72, Bankr. Case No. 10-53019, ECF No. 258.) When asked by counsel for the Debtors whether he thought there was a market for the sale of mid-stream tax credits associated with small properties in small, non-money center banking markets, the Debtors' appraiser testified that his opinion was "no." (*Id.* at 141-143.) The Bank's appraiser disputed this conclusion and instead stated that the market for tax credits is "extremely busy" at the present time. (*Id.* at 174.)

The bankruptcy court issued a Valuation Order on September 12, 2011. In that order, the bankruptcy court weighed the two appraisals and arrived at values for the Debtors' properties. In so doing, the bankruptcy court concluded that the Bank's appraisals more accurately reflected the true value of the Debtors' properties. The bankruptcy court recognized that "[b]oth appraisers stated substantially the same formula for calculating market value under the income capitalization method" although they disagreed on how each component of that formula was derived. (Valuation Order at 13, Bankr. Case No. 10-53019, ECF No. 252.)

As to the vacancy and collection loss rate ("VCLR"), the Debtors' appraiser stated that a minimum of 5% is the industry standard. (Aug. 18, 2011 Tr. of H'rg at 17, Bankr. Case No. 10-53019, ECF No. 258.) The Debtors' appraiser also pointed out that "while historical performance is important, lenders and buyers recognize that conditions can change over the life of the loan and simply will not factor in a vacancy and loss rate of less than 5%, in order to be conservative." (Appellant Br. at 35.) The Bank's appraiser, on the other hand, based his VCLRs on the historically low vacancy rates for most of Debtors' LIHTC properties. With the exception of Nicholasville Greens, all of the Debtors' properties had waiting lists at the time of the Bank's appraisals.

The bankruptcy court analyzed the VCLR for each property and concluded as follows:

| LIHTC Property | Debtors' VCLR | Bank's VCLR | Bankruptcy Court's conclusion |
|---|---|---|---|
| Creekside | 5% | 3% | 3%; based on historical vacancy rate, existing waiting list, and vacancy rates of comparable LIHTC properties |
| Franklin Place | 6% | 3% | 3%; (same as Creekside) |
| Nicholasville Greens | 9% | 11% | 11%; composed of 9% vacancy loss and 2% collection loss |
| Pennyrile | 5% | 3% | 3%; (same as Creekside) |
| Park Row–residential | 4% | 2.5% | 2.5%; based on average historical vacancy rate of 2.45% for 2008 - 2010 |

| Park Row–commercial | 10% | 15% | 15%; one of two commercial units would have to be built-out for light and heat prior to being rented |
| --- | --- | --- | --- |

(Valuation Order at 15-17.)

The parties disagreed on two other figures used in determining the proper value of the Debtors' properties. First, although the parties agreed that a management fee based on 5% of effective gross income was the proper measure for 4 of the 5 properties, they did not agree on that percentage for Nicholasville Greens. Instead, the Debtors' appraiser calculated a management fee of 4% of effective gross income, while the Bank's appraiser used a management fee of 5%. Because the management fee for Nicholasville Greens averaged 4.875% over the last four years, the bankruptcy court used the Bank's figure of 5%. (*Id.* at 17.)

Second, the parties disagreed as to the proper real estate tax expense to use in valuing the Debtors' properties. Although both appraisers stated "that the Debtors' real estate taxes were significantly higher than they should be as reflected by comparable LIHTC Properties," the bankruptcy court concluded that only "[t]he Bank's Appraiser reduced the real estate tax expense to an amount that would be consistent with his opinion of the market value of the Debtors' real estate for each particular LIHTC Property before any adjustments for the Remaining Tax Credit Value." (*Id.* at 18-19.) The Debtors' appraiser only reduced the expense for three of the five properties. The bankruptcy court found the Bank's appraiser's testimony "that a fair market purchaser will consider the effect of the purchase price on future property taxes in his decision regarding the value of (and thus price to pay for) the property" to be more credible. (*Id.* at 19.) However, because the Bank's appraiser failed to complete all of the necessary "calculation[s] once the effect of the Remaining Tax Credits was included in his opinion of fair market value, . . . the Court adjusted the real estate tax component . . . to arrive at the annual real estate tax that is consistent with the Court's findings regarding the fair market value of each property." (*Id.*) The bankruptcy court used the assessment rates set forth in the Bank's appraisals in order to do these calculations since the Bank's appraisals contained the most current information. (*Id.* at 19, n. 14.)

Turning to the issue of the remaining tax credits, the bankruptcy court stated:

> The Remaining Tax Credits are not being valued as if they are being sold. As previously held, the Remaining Tax Credits cannot be separated from the Debtors' LIHTC Properties and sold separately. . . . "Although market participants often talk casually about "selling" the tax credits, they are actually referring to selling a partial ownership interest in the *entity that owns the real estate*. The tax credits themselves cannot be severed from the ownership of real estate." Appraising Low-Income Housing Tax Credit Real Estate, 10/1/10 APPRAISAL J. 350 (emphasis added).
>
> . . . .
>
> . . . Debtors chose to ignore the fact [that] the Remaining Tax Credits impact the value of the property, are owned by the Debtors and that any rights/benefit/burdens of the Remaining Tax Credits which inure to the limited partners do so only as a result of their ownership/partnership interests in the Debtors. If the LIHTC Properties are sold, all proceeds of a sale belong to the respective Debtor with any benefits of the Remaining Tax Credits flowing through the new entity to the owners of that new entity.

(*Id.* at 20-22.) Because the Bank "provided the only detailed, substantiated evidence of the impact of the Remaining Tax Credits on the market value of the Debtors' LIHTC Properties," the bankruptcy court included the value of the remaining tax credits in its § 506(a) valuation of the Debtors' property. (*Id.*)

After considering all the evidence, the bankruptcy court set the following values for the Debtors' real properties:

| LIHTC Property | Value of Real Estate | Value of Tax Credits | Total Value |
|---|---|---|---|
| Creekside Senior Apartments | $708,718.67 | $350,000 | $1,058,718.67 |
| Nicholasville Greens Townhomes | $307,475.86 | $160,000 | $467,475.86 |
| Franklin Place Senior Apartments | $371,244.42 | $445,000 | $816,244.42 |
| Pennyrile Senior Apartments | $446,188.44 | $755,000 | $1,201,188.44 |
| Park Row Senior Apartments | $727,427,01 | $865,000 | $1,592,427.01 |

(*Id.* at 23-28.)

After the valuation hearing, but prior to entry of the Valuation Order, the Debtors and their General Partners had filed a notice of appeal and a motion for leave to appeal the bankruptcy court's *In Limine* Order as it related to the Debtors' Valuation Objection. On September 26, 2011, the Debtors and General Partners filed an amended notice of appeal to include an appeal of the bankruptcy court's Valuation Order. This appeal was timely.

## IV.    DISCUSSION

A.    *11 U.S.C. § 506(a)(1) & 26 U.S.C. § 42*

Section 506(a)(1) of the Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1). In valuing property under this section, a court must engage in a two-step process. First, "a court must compare the creditor's claim to the value of 'such property,' *i.e.*, the collateral." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 961, 117 S. Ct. 1879, 1884-85 (1997). This determination necessarily requires the court to ascertain the "creditor's interest in the estate's interest in" the property. 11 U.S.C. § 506(a)(1). The second step in the valuation process requires the court to determine how to value the collateral. *Rash*, 520 U.S. at 961-62. When a debtor proposes to retain property and continue to use the property in the debtor's trade or business, the proper methodology to use in establishing "the amount of the secured claim under § 506(a) . . . is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960. Although *Rash* was decided in the context of Chapter 13, its holding applies equally to valuation of secured claims in Chapter 11. *In re Heritage*

*Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012). The Debtors and General Partners allege that the Debtors do not have any ownership interest in the tax credits and that the tax credits are not part of the Bank's collateral. Therefore, the Debtors assert the value of the remaining tax credits are not properly included in determination of the secured portion of the Bank's claim.

The Bank asserts Debtors' arguments are flawed because the right to claim the low-income housing tax credits goes to the owner of the LIHTC property and this right cannot be separated from the land. The bankruptcy court agreed with the Bank. (*See In Limine* Order at 4-5 Bankr. Case No. 10-53019, ECF Nos. 235 and 252) (referenced in Valuation Order at 20, Bankr. Case No. 10-53019, ECF No. 252.) Additionally, the bankruptcy court concluded that:

> Debtors chose to ignore the fact the Remaining Tax Credits impact the value of the property, are owned by the Debtors and that any rights/benefit/burdens of the Remaining Tax Credits which inure to the limited partners do so only as a result of their ownership/partnership interests in the Debtors. If the LIHTC Properties are sold, all proceeds of a sale belong to the respective Debtor with any benefits of the Remaining Tax Credits flowing through the new entity to the owners of that new entity.

(Valuation Order at 22, Bankr. Case No. 10-53019, ECF No. 252.)

The Low-Income Housing Tax Credit program is provided for in § 42 of the Internal Revenue Code. 26 U.S.C. § 42. The program provides an incentive to develop low-income housing properties in exchange for a 10-year stream of tax credits. 26 U.S.C. § 42(b)(1)(B). The availability of the tax credits is dependent on the property maintaining compliance with the Low-Income Housing Tax Credit program's rent and occupancy restrictions. *See* 26 U.S.C. § 42.

Section 42(b)(1) provides that, for purposes of calculating the amount of the low-income housing credit,

> the term "applicable percentage" means, with respect to any building, the appropriate percentage prescribed by the Secretary for the earlier of—

>> (i) the month in which such building is placed in service, or

(ii) at the election of the taxpayer--

(I) the month in which the taxpayer and the housing credit agency enter into an agreement with respect to such building (which is binding on such agency, the taxpayer, and all successors in interest) *as to the housing credit dollar amount to be allocated to such building . . . .*

26 U.S.C. § 42(b)(1) (emphasis added). Additionally, as recognized by the bankruptcy court, if a low-income housing property is sold prior to the conclusion of the compliance period,

the credit allowable . . . to the taxpayer for any period after such acquisition shall be equal to the amount of credit which would have been allowable . . . for such period to the prior *owner* . . . had such *owner* not disposed of the building.

26 U.S.C. § 42(d)(7)(A)(ii) (emphasis added). These sections make clear that the low-income housing tax credits are attached to the low-income housing property and belong to the owner of such property. "The tax credits are better characterized as 'rights and privileges' belonging to the land under the definition of 'real property' . . . as they do not exist separate from an ownership right in the low-income housing." *Brandon Bay, Ltd. P'ship v. Payette Cnty.*, 132 P.3d 438, 441 (Idaho 2006). "Because the tax credits are rights and privileges that directly relate to the real estate, they are properly considered in assessing the value of low-income housing." *Id.*

The various exhibits in this case bolster this conclusion. Section 2(b) of the LURAs states that the covenants and the restrictions set forth therein are "covenants running with the Project." (LURA Section 2(b), Bankr. Case No. 10-53019, ECF Nos. 204-4 at 25, 204-8 at 5, 204-12 at 16, 204-16 at 11 and 204-20 at 14.) Section 6.6 of the Partnership Agreements states "[e]xcept for the Apartment Complex, the Housing Tax Credits, and the contractual rights referred to herein, the [Limited] Partnership [aka the Debtor] owns no other property, tangible or intangible, real or personal." (Amended and Restated Partnership Agreements, section 6.6(A), Bankr. Case No. 10-53019, ECF No. 214-1 through 214-15.) This section demonstrates that the Debtors own the low-income housing tax credits. The "Low Income Housing Tax Credit Certificate of Carryover Allocation" letters from KHC identify the "Taxpayer Receiving Allocations" as the Debtors. (Tax Credit Letters, Bankr. Case No. 10-53019, ECF No. 204-29 at 1-6.) Additionally, section 9.1G(v)

of the Partnership Agreements state that tax credits shall be *allocated* among the partners, just as profits and losses are allocated among the partners. (Amended and Restated Partnership Agreements, section 9.1G(v), Bankr. Case No. 10-53019, ECF No. 214-1 through 214-15.) Nowhere in the partnership agreements is there an indication that the tax credits are sold or otherwise conveyed to the partners.

In a case factually analogous to the one before the Panel, a limited partnership, Pine Pointe, entered into a land-use restriction agreement with the state housing authority in exchange for the allocation of low-income housing tax credits. *Pine Pointe Hous., L.P. v. Lowndes Cnty. Bd. of Tax Assessors*, 561 S.E.2d 860 (Ga. Ct. App. 2002). The limited partnership agreement allocated 99% of the tax credits to Pine Pointe's limited investor partners. Following an ad valorem tax assessment on the property, Pine Pointe appealed the assessment. The issue on appeal was how to determine the fair market value of the property "given the rental restrictions and the federal tax benefits applicable to the project." *Id.* at 862. Although the ultimate issue in the *Pine Pointe* case was different, two of the holdings are applicable to the case currently before the Panel.

In its appeal, Pine Pointe asserted that the tax credits had been effectively sold to its limited investor partners by virtue of the limited partnership agreement and thus had no value to Pine Pointe. Pine Pointe therefore alleged that inclusion of the value of the remaining tax credits was in error. The Georgia Court of Appeals rejected this argument based on the provisions of 26 U.S.C. § 42(d)(7) which state that, when the property is sold, the subsequent owner is entitled to claim the remaining tax credits. *Id.* at 863. The court held that because the tax credits run with the land, they cannot be severed from the property and sold to an investor.

The *Pine Pointe* court also concluded that "[b]ecause Section 42 tax credits are generated by a designated property, a third party would pay for the value as part of that property's sale price in a bona fide, arm's length transaction." 561 S.E.2d at 863. "Furthermore, the tax credits go hand in hand with restrictive covenants that require the property to charge below-market rent" and, therefore, the tax credits run with the land. *Id.*

In another case factually identically to the one before the Panel, *Spring Hill, L.P. v. Tenn. State Bd. of Equalization*, No. M2001-02683-COA-R3-CV, 2003 WL 23099679 (Tenn. Ct. App. Dec. 31, 2003), the taxpayers appealed from property tax assessments that included the present value of the remaining low-income housing tax credits authorized by § 42 of the Internal Revenue Code. The taxpayers were three limited partnerships who owned low-income housing tax credit properties. After the low-income housing tax credits were awarded by the Tennessee state agency tasked with administering the low-income housing tax credit program, the taxpayers allocated the right to claim the annual tax credits to limited partner investors. *Id.* at *2.

Like the Debtors in this case, the owners contracted with the state agency to receive the tax credits in exchange for surrendering a portion of their property rights, *i.e.*, the right to charge higher rents and to use the property without restraint. "[B]ecause the tax credits may be transferred to purchasers" and because the "tax credits made ownership of the properties more desirable to" the owners of the properties, the trial court determined that the low-income housing tax credits "enhance[d] the value of the properties in the marketplace." *Id.* at *4. The court of appeals affirmed and stated "the real economic benefit caused by [the tax credits] has a significant impact on the value of the property and must, therefore, be analyzed when determining the fair value of the property." *Id.* at *11.

> [A]lthough the owner of the property had, by the limited partnerships, internally allocated the right to receive the Tax Credits to limited partners in exchange for a discounted lump sum payment by investors, the assignment of this right is the equivalent of any number of other financing tools available.

*Id.* (summarizing prior decision of Tax Board which found syndication of tax credits did not serve to exclude the consideration of tax credits in determining a property's value).

In determining that the value of the tax credits was properly included in the value of the property at issue in the case, the *Spring Hill* court recognized that

> [w]hile some [other states] have found that the Tax Credits should not constitute a factor in assessing the value of the real property, the majority take the position that, absent legislation to the contrary, the Tax Credits should be used as a factor in

> determining the fair market value of the real property upon which they were awarded.
>
> . . . .
>
> In these cases, the courts determined that only consideration of both the value-decreasing factor of restricted rents along with the value-increasing factor of the Tax Credits provides a full and accurate picture of the property's worth.

*Id.* at *12-13 (citations omitted). The *Spring Hill* court agreed. Because the "issue is 'whether the price that a willing buyer and seller would agree upon would take into account the tax credits,' " the value of "[i]ntangible factors should be considered when they affect the value, either upward or downward." *Id.* at *14.

Kentucky has not excluded the consideration of tax credits in assessing property values either by statute or case law. Although the Debtors and General Partners argue that Kentucky partnership law and federal tax law "recognize[ ] the ability of limited partnerships to syndicate partnership interests – and, of paramount importance, the attendant tax credits – to limited partners," they cite no authority for their argument. (Appellant Reply Br. at 3-4.) And, although this may be true, the fact that allocation of tax credits is allowed does not mean that such allocation has the effect of transferring ownership of the low-income housing tax credits away from the property owner.

In this appeal, the Debtors and the General Partners argue that the cases cited by the Bank are inapposite because the underlying policy considerations in those cases are tax policies, not the policies of § 506(a) of the Bankruptcy Code. Nevertheless, these cases are relevant in demonstrating that, just as the property tax rate can affect the value of real property, so too can the availability of tax credits. Indeed, in using an income analysis to value real property, it would be incongruous to consider the limitations imposed by land use restrictions but not consider the associated benefits of tax credits made available to the property's owners. For example, real property may be owned subject to certain restrictions in furtherance of historic preservation that limit its value, while at the same time providing the owner with a reduced property tax rate or even complete tax abatement. In such a situation, it would be inconsistent to consider the limitations imposed by the historic preservation restrictions without also considering the effect that a reduced

or zero tax rate would have on the net income generated by the property. Ultimately, both the benefits and the burdens associated with property ownership are relevant in valuing the real property.

The Debtors cite the case of *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S. Ct. 3143 (1986), in support of their position that the tax credits are not collateral in which the Bank could take a security interest and, therefore, cannot be included within the Bank's secured claim; however, the Supreme Court's decision in *Randall* is readily distinguished and is not inconsistent with the bankruptcy court's valuation analysis in the case currently before the Panel. In *Randall*, the Supreme Court considered whether an award of damages in a prospectus securities fraud case must be offset by the tax benefits received by defrauded investors. The Supreme Court held, under the plain meaning of the statute, that the "offset for 'income received' on the security does not encompass the tax benefits received by defrauded investors by virtue of their ownership of the security, because such benefits cannot, under any reasonable definition, be termed 'income.' " *Id.* at 656.

The Supreme Court then added:

> [The tax credits] have no value in themselves; the economic benefit to the investor- the true "tax benefit"- arises because the investor may offset tax deductions *against* income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income. Unlike payments in cash or property received by virtue of ownership of a security . . . "receipt" of tax deductions or credits is not itself a taxable event, for the investor has received no money or other "income" within the meaning of the Internal Revenue Code.

*Id.* at 657 (citing 26 U.S.C. § 61).

The Debtors and General Partners assert that *Randall* stands for the proposition that tax credits have no value in and of themselves and are not property in which an enforceable lien can be taken. Their reliance on *Randall* is misplaced; *Randall* addressed the measure of damages under the remedy of rescission in a securities fraud case. The key issue in the present case is different – namely, whether the tax credits associated with the ownership of real property can be considered in determining the value of that real property. In short, nothing in *Randall* suggests that a court cannot consider the effect that tax credits associated with the ownership of real property have when valuing that real property.

The Debtors also rely on the case of *City of Chicago v. Michigan Beach Housing Cooperative*, 609 N.E.2d 877 (Ill. App. Ct. 1993). In *Michigan Beach*, the City of Chicago argued that, because its security interest extended to proceeds of its collateral, its security interest extended to the syndication funds that investors paid to purchase interests in a limited partnership that owned a low-income housing complex and held the right to claim certain income tax credits. The trial court held that the language of the city's security agreement did not cover the income tax credits, and the Illinois Court of Appeals affirmed. *Id.* at 884-85. The Illinois Court of Appeals also found the city's argument unavailing "because income tax credits cannot be intangible personal property subject to a security interest under Article 9." *Id.* at 885. In following *Randall*, the Illinois Court of Appeals explained:

> Applying the Supreme Court's analysis in *Randall* to the case at bar, we are led ineluctably to the conclusion that the tax credits at issue cannot serve as collateral because they are not general intangible personal property. Tax credits, as *Randall* instructs us, have no independent value in and of themselves; instead, they are an incidental benefit that investors receive when they purchase a security evidencing their interest in a limited partnership. The investors cannot transfer or sell the tax credits separate from the security itself. The limited partnership did not "sell" the tax credits to the investors; the tax credits remain exactly where they resided before the sale of the securities, in the limited partnership. Accordingly, it is clear that the NTC defendants in this case did not purchase and do not own tax credits; instead, they bought and now possess securities which gave them an interest in the Michigan Beach Limited Partnership. The tax credits they received along with their interest in the partnership were incidental benefits of that investment - not separate intangible personal property which could collateralize the city's loan - and whatever benefit they conferred on the investor renders no comfort to the city.

*Id.* at 886.

Although the Debtors and General Partners quoted at length from this paragraph of the opinion in support of their argument that the value of the Bank's secured claim does not include the value of the remaining tax credits, they omitted and replaced with ellipses a key sentence:

> The limited partnership did not "sell" the tax credits to the investors; *the tax credits remain exactly where they resided before the sale of the securities, in the limited partnership.*

*Id.* (emphasis added). Even when an entity allocates the rights to use the low-income housing tax credits to investors, it does not lose ownership of the tax credits. The tax credits remain with the

property and with the owner of the property. As the bankruptcy court recognized in this case, "[t]he [investor] limited partners may have become entitled to the allocation of the Tax Credits through the respective partnership agreements, but they did not become the owners of the Tax Credits through those agreements." (*In Limine* Order at 4, Bankr. Case No. 10-53019, ECF No. 235.) In short, the *Michigan Beach* case is consistent with the bankruptcy court's analysis that the right to the tax credits remains in the limited partnership that owns the real property, and not with the investors who purchased an ownership interest in the limited partnership.

The Debtors in this case still own the tax credits, and the tax credits are covenants running with the real properties. This is true even though the Debtors allocated the credits to the investor limited partners. *See Spring Hill*, 2003 WL 23099679. As a result, determination of the Bank's interest in the Debtors' interest in the LIHTC properties must include consideration of the value of those credits. Because "[a] willing buyer would most certainly consider the availability of section 42 tax credits when determining the fair cash value of the property," the bankruptcy court in this case was correct in concluding that the value of the remaining tax credits is properly included in determining the value of the Bank's secured claim. *Rainbow Apartments v. Ill. Prop. Tax Appeal Bd.*, 762 N.E.2d 534, 537 (Ill. App. Ct. 2001).

The Debtors and General Partners seemingly fail to understand a key issue in this case. The question before the bankruptcy court was not whether the Bank has an independent security interest in the tax credits. The issue was whether the fair market value of the various apartment complexes secured by the Bank's mortgages should reflect the value of the remaining tax credits. The Bank did not argue, nor did the bankruptcy court determine, that the Bank was entitled to claim the tax credits on its tax returns. Nor did the Bank argue that it owned or had a separate security interest in the tax credits or in the money paid by the investors in exchange for allocation of the tax credits. The only aspect of the tax credits at issue in this case is whether the value of the remaining credits affects the value of the Bank's collateral and, thus, the amount of the Bank's secured claim.

The ability to claim the low-income housing tax credits pursuant to 26 U.S.C. § 42 flows from the property owner's agreement to comply with the rent and occupancy restrictions of the Low-Income Housing Program. If the owners fail to comply with those restrictions, the owners,

or whomever they allocate the right to claim the tax credits to, lose the benefits of the tax credits. Simply stated, without the burden, there is no benefit.

Because the restrictions limit the amount of income an owner can realize from low-income housing properties, the restrictions affect the price a willing seller would agree to pay for such properties. The Debtors and the General Partners do not dispute this, and their appraisals state that the estimated market value was calculated in light of the rent and occupancy restrictions. If the burden impacts the value, the benefits must as well. In short, the bankruptcy court did not err when it concluded, consistent with the Internal Revenue Code, relevant case law, and the record before it, that the value of the remaining tax credits is properly included in determining the amount of the Bank's secured claim.

B.      *Weighing of Evidence in Determining Value Under § 506(a)*

The Debtors and General Partners also allege that the bankruptcy court erred in accepting the Bank's appraisal figures in setting the value of the real properties and in determining the value of the remaining tax credits.

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. Courts have broad discretion in admitting expert witnesses and weighing testimony. *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3rd Cir. 2001) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153, 119 S. Ct. 1167 (1999)). "Judging the credibility and mental capacity of witnesses and resolving conflicts in the evidence are within the unique capacity of the factfinder" and a court's determinations on such issues will not be disturbed on appeal unless clearly erroneous. *United States v. Baker*, 807 F.2d 1315, 1320 (6th Cir. 1986).

"The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either." *Boyle v. Wells* (*In re Gustav Schaefer Co.*), 103 F.2d 237, 242 (6th Cir. 1939). "Because the

valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses." *In re Smith*, 267 B.R. 568, 572 (Bankr. S.D. Ohio 2001).

> In examining the valuations given to the debtors' property, the court notes that valuation is ultimately the opinion of a particular appraiser and, as such, the weight to be accorded the opinion rests upon a number of factors frequently used by courts in evaluating appraisal testimony. A nonexclusive listing of these factors includes: the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented.

*Buckland v. Household Realty Corp.* (*In re Buckland*), 123 B.R. 573, 578 (Bankr. S.D. Ohio 1991). "A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion of the value of the subject property after considering the appraisals and expert testimony." *Smith*, 267 B.R. at 572-73.

When faced with setting a value for a low-income housing tax credit property, a court's job is difficult.

> [S]ales of LIHTC properties are very rare. When sales do occur, they are difficult to compare because the land use restrictions may be quite different from one LIHTC property to another. The extreme scarcity of comparable sales and the difficulties in evaluating the differences between the comparable properties' LURAs present formidable obstacles to performing a credible sales comparison approach for an LIHTC property.

Kenneth N. Alford & David C. Wellsandt, *Appraising Low-Income Housing Tax Credit Real Estate,* 10/1/10 APPRAISAL J. 350 (Oct. 1, 2010).

In the case currently on appeal, the bankruptcy court found both appraisers to be qualified as experts. (Valuation Order at 10, Bankr. Case No. 10-53019, ECF No. 252.) The bankruptcy court also found that both appraisers, as certified appraisers, had extensive experience in appraising low-income housing tax credit properties and that both appraisers used an accepted method of valuing the property. Although both appraisers agreed that the income capitalization approach was the most reliable one to use for income-producing properties, the appraisers disagreed how to

calculate the vacancy and collection loss rate, or VCLR, and the proper management fee. They also disagreed about which real estate tax expenses to use.

With respect to the tax credits, the Debtors and General Partners argue that the bankruptcy court erred in accepting the Bank's appraiser's value of the credits because the Bank's appraiser did not consider the impact of the tax credits. Instead, he merely valued the remaining tax credits. The bankruptcy court rejected this argument and determined that the Bank's appraisal of the tax credits was valid.

> The Court finds Mr. Donan's testimony on the issue of the impact of the Remaining Tax Credits to be credible and further finds that the Debtors' evidence presented on rebuttal is too little, too late. The Debtors' Rebuttal Exhibit lacks the details, analysis and substantiation contained in the Bank's Appraisals. Debtors chose to ignore the fact [that] the Remaining Tax Credits impact the value of the property, are owned by the Debtors and that any rights/benefit/burdens of the Remaining Tax Credits which inure to the limited partners do so only as a result of their ownership/partnership interests in the Debtors. . . . When backed into a corner, Debtors finally chose to compute a value for the Remaining Tax Credits by challenging the methodology used by the Bank's Appraiser with unsupported assertions of components missing from Mr. Donan's calculations.

(Valuation Order at 20-22, Bankr. Case No. 10-53019, ECF No. 252.)

After thoroughly reviewing the record and the briefs in this matter, it does not appear that the bankruptcy court abused its discretion in finding the Bank's appraisal more accurately reflected the true value of the properties under § 506(a), nor was that finding clearly erroneous. Although the Debtors argue that their appraiser's approach was "far more nuanced and better reasoned," they offer no true support for their assertion, which ignores the instruction given their appraiser not to factor the tax credits in his analysis. (Appellant Br. at 35.) As pointed out above, there is no exact science for determining the value of low-income housing tax credit properties. The bankruptcy court had copies of all the appraisals as well as the opportunity to assess the credibility of each appraiser in the courtroom. The bankruptcy court analyzed the market conditions as set forth by both appraisers and determined that the Bank's figures were more accurate. Quite simply, the bankruptcy court did what it was tasked with doing: determining which report more accurately reflected the market conditions for these properties.

With respect to the tax credits, the bankruptcy court was correct in determining their value was included when assessing the value of the Bank's secured claim. Because the Debtors held fast to their contention that the value of the tax credits was not properly included in the claim, they failed to timely introduce any evidence of the credits. When pressed at the hearing, their appraiser finally agreed that the Bank's appraiser used an accepted methodology, but contended that he had used some incorrect figures in calculating the value. The Debtors, however, failed to convince the bankruptcy court that the figures used by the Bank's appraiser were invalid.

The Debtors further argue that the Bank's appraisal of the tax credits was flawed because the appraiser failed to analyze the partnership agreements and the Debtors' current debt structure. The Debtors allege that this failure is in violation of the Uniform Standards of Professional Appraisal Practice ("USPAP"); however, the bankruptcy court considered this argument and found that the Bank's appraiser properly set forth the extraordinary assumptions and limiting conditions in compliance with the requirements of the USPAP and that he reached a credible result as to the value of the remaining tax credits. This was not an abuse of the bankruptcy court's discretion.

In this case, the bankruptcy court engaged in a thorough analysis of the appraisals and the appraisers' qualifications. The bankruptcy court set forth a detailed analysis of why it gave more weight to the Bank's figures as compared to those of the Debtors. Additionally, the bankruptcy court also set forth a detailed explanation of why it deviated from those of the Bank's appraisals regarding the tax expense calculation. The bankruptcy court's reliance on the Bank's appraisals and its calculation of the final values was well-reasoned. There was neither clear error nor an abuse of discretion in the bankruptcy court's analysis.

C.      *Order Overruling Debtors' Valuation Objection and Motion In Limine*

The Debtors assert that the bankruptcy court erred in overruling their Valuation Objection and Motion *in Limine* on August 15, 2011, because those portions of the appraisals and related testimony about the remaining tax credits were "not based on sufficient facts and data" and did "not conform to accepted principles and methodologies in the industry . . . ." (Mem. in Support of Mot. *in Limine* at 1, Bankr. Case No. 10-53019, ECF No. 215-1.) Specifically, the Debtors and General

Partners asserted that the Bank's appraiser's reports did not comply with the USPAP. The Debtors and General Partners also argued that the value of the remaining tax credits was irrelevant to the valuation issue because the tax credits were not part of the Bank's collateral.

In their brief, the Debtors and General Partners allege that their Valuation Objection and Motion *In Limine* should have been granted in light of Federal Rule of Evidence 702 which governs testimony by expert witnesses and provided as of the valuation hearing:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (version in effect prior to general restyling of the Federal Rules of Evidence effective December 1, 2011). There are essentially three components in making a Rule 702 determination. A court must determine (1) if the witness is qualified by "knowledge, skill, experience, training, or education; (2) if the witness' opinion or testimony will "assist the trier of fact;" and (3) if the testimony is reliable "which is shown by the satisfaction of the three numbered elements in Rule 702." *Kaylor v. Holsinger* (*In re Holsinger*), 437 B.R. 260, 270 (Bankr. S.D. Ohio 2010) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, at 528-29 (6th Cir. 2008)).

> Importantly, the court does not assess the credibility and accuracy of expert opinion when determining the reliability of the expert opinion, but must only ensure that the opinion is made upon a reliable factual foundation and is not unsupported speculation. [*Scrap Metal Antitrust Litig.*, 527 F.3d] at 529-30. Ultimately, the court has broad discretion in determining the admissibility of expert testimony and "the gatekeeping inquiry must be [tied to the facts of a particular case.]" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, [150], 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

*Holsinger*, 437 B.R. at 270.

Rule 702's requirement that the proffered testimony "assist the trier of fact" requires the testimony be relevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S. Ct. 2786 (1993). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo,

non-helpful." *Id.* (citation omitted) (internal quotation marks omitted). Essentially, this requirement mandates that the expert testimony "is sufficiently tied to the facts of the case that it will aid the [factfinder] in resolving a factual dispute." *Id.* (citation omitted) (internal quotation marks omitted). "T[he] relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved at trial." *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 822 (N.D. Ohio 2011). As long as the testimony relates to an issue the factfinder must determine, it is relevant. *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 Fed. App'x 643, 652 (6th Cir. 2009). Additionally,

> [t]he Court's "requirement that 'any and all scientific testimony or evidence admitted [be] not only relevant, but reliable,' 'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"

*Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008) (citations omitted).

"The inquiry [under Rule 702] is . . . a flexible one. . . . The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir.1998) (internal citations omitted).

> In *Daubert,* the Supreme Court "established a general gatekeeping [or screening] obligation for trial courts" to exclude from trial expert testimony that is unreliable and irrelevant. *Hardyman v. Norfolk & W. Ry. Co.,* 243 F.3d 255, 260 (6th Cir.2001) (citation and internal quotation marks omitted). The district court must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Id.* (citation omitted). In assessing relevance and reliability, the district court must examine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Jahn v. Equine Servs., PSC,* 233 F.3d 382, 388 (6th Cir.2000) (citations omitted). This involves a preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* (citation and internal quotation marks omitted). Some of the factors that may be used in such an inquiry include: (1) whether the theory or technique has been tested and subjected to peer review and publication, (2) whether the potential rate of error is known, and (3) its general acceptance. *Hardyman,* 243 F.3d at 260.

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note. The party seeking to introduce the expert testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

With respect to a claim that a method used in an appraiser's report does not comply with the USPAP, there is no authority "for the proposition that an appraiser's compliance with USPAP is the sole determining factor as to whether an appraiser's valuation report is reliable." *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010). This is especially true when the trial court is the "factfinder as well as the expert-testimony gatekeeper . . . ." *Id.* The issue of whether an appraiser's report complied with USPAP standards goes to "the *weight* [the] report should be given, instead of whether it should be admitted." *Id.*. "[T]he nature and extent of the deviations [from USPAP] concern only the report's *credibility* . . . ." *Id.*; *see also Wal-Mart Stores, Inc. v. Qore, Inc.*, No. 1:06CV326, 2009 WL 224908, at *3 (N.D. Miss. Jan. 28, 2009). This is true even if an appraiser, like the Bank's appraiser in this case, makes "extraordinary assumptions in coming to his ultimate conclusion." *Id*.

When a party agrees that an expert witness used an accepted methodology, but that the data used in applying that methodology was flawed, such an allegation does not require a court to exclude the testimony or report. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345-46 (11th Cir. 2003). Instead, "such an attack goes to the weight of the evidence, rather than to its admissibility." *Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citing *Quiet Tech. DC-8*, 326 F.3d at 1345) (" 'Thus, the alleged flaws in [the appellee's] analysis are of a character that impugn the *accuracy* of his results, not the general scientific *validity* of his methods.' "). "The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech. DC-8*, 326 F.3d at 1345; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Because a "trial court has broad discretion in admitting and excluding expert testimony," such a determination will be upheld on appeal unless there was an abuse of discretion or unless the

decision was "manifestly erroneous." *Gen. Electric Co. v. Joiner*, 522 U.S. 136, 141-42, 118 S. Ct. 512, 517 (1997); *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 962 (6th Cir.1990). However, "a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *Scrap Metal Antitrust Litig.*, 527 F.3d at 529. Instead, a court must determine whether an expert witness's opinion is accurate in deciding what weight to give to that opinion at trial. *Id.* at 531.

In the case currently before the Panel, the Debtors and General Partners allege that the Bank's appraisal of the value of the remaining tax credits "materially fail[s] to comply with the USPAP standards" because the "valuation of the remaining Tax Credits is based upon 'extraordinary assumptions.' " (Appellant Br. at 29.) According to the Debtors and General Partners, the "extraordinary assumptions" used by the Bank's appraiser "reflect 'assignment conditions' that restrain appropriate due diligence 'to such a degree that the assignment results are not *credible*,' per the USPAP." (Appellant Br. at 30-31) (emphasis added.)

Despite these allegations, the Debtors' own appraiser testified that the Bank's appraiser used an accepted methodology in calculating the value of the remaining tax credits. When asked by Bank's counsel if he agreed with Donan's methodology, the Debtors' appraiser stated:

> There are certain issues I have with – with application of the methodology. The general methodology, no, but there are certain things that are missing, key components that are missing as part of applying the methodology that he applied.

(August 18, 2011 Tr. of H'rg at 144.)

In analyzing Debtors' arguments, the bankruptcy court noted that, by using an extraordinary assumption, the Bank's appraiser concluded that he could still reach a credible result. The bankruptcy court also held that the use of the extraordinary assumption was allowed by the USPAP. (*See In Limine* Order at 6-8, Bankr. Case No. 10-53019, ECF No. 235.) Based on these holdings, the bankruptcy court concluded that "the Debtors' arguments go to the weight of the evidence, not to its reliability." (*Id.* at 8.)

Whether the Bank's appraiser complied with USPAP is not a determining factor as to whether an appraisal is reliable. It may impact whether or not the report is credible, but does not determine the admissibility of the report. Additionally, as long as an appraiser uses a methodology that is accepted in the industry, his report is admissible. If, in applying the methodology, the appraiser uses incorrect data or the appraiser's use of the methodology is somehow flawed, a court is not required to exclude the testimony or report. Instead, the error may affect the weight the testimony or report is given.

In the case presently before the Panel, the bank's appraiser developed an "extraordinary assumption" as provided for in USPAP in valuing the remaining tax credits. Although the Debtors assert that the assumption was wrong, their own appraiser testified that the methodology the Bank's appraiser used in valuing the remaining tax credits was an accepted one in the industry. As a result, the bankruptcy court did not abuse its broad discretion in declining to exclude those portions of the Bank's appraisals which included valuation of the remaining tax credits.

As for the Debtors' argument that the value of the remaining tax credits was irrelevant to the valuation issue, such argument must fail. The ultimate issue the bankruptcy court had to determine was the value of the secured portion of the Bank's claim. A major component of this determination was whether the value of the remaining tax credits would influence the price offered by a hypothetical willing purchaser of the property that serves as collateral for the Bank's claims. As a result, the issue of whether the tax credits had any value was relevant to the issue before the bankruptcy court, and the bankruptcy court properly denied the Debtors' Motion *In Limine.*

## V.  CONCLUSION

For the foregoing reasons, we affirm the bankruptcy court's orders setting the market value of the Debtors' low-income housing tax credit properties and overruling the Debtors' and the General Partners' Valuation Objection and Motion *In Limine*.