*By order of the Bankruptcy Appellate Panel, the precedential effect of this decision is limited to the case and parties pursuant to 6th Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1(c).*

**File Name:  13b0006n.06**

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re:  CARL MACE and | ) | |
| CINDY MACE, | ) | |
| | ) | No. 12-8025 |
| Debtors. | ) | |

_____

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio
Case No. 10-42899, Adv. No. 10-04239

Submitted: May 14, 2013

Decided and Filed: August 13, 2013

Before: EMERSON, McIVOR, AND PRESTON, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

_____

**ON BRIEF:** Gary J. Rosati, Niles, Ohio, for Appellants.   P. Raymond Bartholomew, BARTHOLOMEW, MUDRINICH & NESBIT, Hermitage, Pennsylvania, for Appellees.

_____

**OPINION**

_____

GEORGE W. EMERSON, Bankruptcy Appellate Panel Judge.  The Debtors, Carl and Cindy Mace, appeal an order overruling their objection to an unsecured claim in the amount of

1

$313,781.36. The claimants are the Debtors' former business partners in a feed and livestock supply corporation. The claim is based on a breach of an oral promise Carl Mace allegedly made to have the claimants released from liability for a business debt. In overruling the Debtors' objection to the claim, the bankruptcy court held that the Debtors failed to rebut the prima facie validity of the claim. For the reasons set forth below, the bankruptcy court's order overruling the Debtors' objection to claim is REVERSED.

## ISSUES ON APPEAL

The issues presented in this appeal are: (1) Whether the bankruptcy court erred in finding that Mace made an enforceable oral agreement with the Kellys to release them from their liability as guarantors on a loan; and (2) Assuming the facts support a finding there was an oral agreement, did the bankruptcy court err in finding that the oral agreement gave rise to a legal liability for damages?

## JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Northern District of Ohio has authorized appeals to the BAP, and no party has timely elected to have this appeal heard by the district court. 28 U.S.C. § 158(b)(6), (c)(1). A "final" order of a bankruptcy court may be appealed by right under 28 U.S.C. § 158(a)(1). For purposes of appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 797, 109 S. Ct. 1494, 1497 (1989) (internal quotations and citations omitted). A bankruptcy court's order overruling debtor's objection to claim is a final order for purposes of appeal. *Morton v. Morton* (*In re Morton*), 298 B.R. 301, 303 (B.A.P. 6th Cir. 2003) (citation omitted).

This Panel reviews the bankruptcy court's findings of fact for clear error. Fed. R. Bankr. P. 8013; *Rosinski v. Boyd* (*In re Rosinski*)*,* 759 F.2d 539, 540 (6th Cir.1985). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S. Ct. 1504 (1985) (citation omitted) (internal quotation marks omitted). The Panel reviews the bankruptcy court's conclusions of law de novo. *See, e.g., Corzin v. Fordu* (*In re Fordu*)*,* 209 B.R. 854, 857 (B.A.P. 6th Cir. 1997), *aff'd,* 201 F.3d 693, 696 n.1 (6th Cir.1999).

A "court's rulings on evidentiary matters will only be reversed on a clear showing of abuse of discretion." *In re Creekside Senior Apartments, L.P.*, 477 B.R. 40, 46 (B.A.P. 6th Cir. 2012)(internal quotation marks and citations omitted). A court has broad discretion in ruling on evidentiary requests and those decisions will only be reversed if the abuse of discretion caused more than harmless error." *In re Pertuset*, 485 B.R. 478 (B.A.P. 6th Cir. 2012) (internal quotation marks and citations omitted). "This means the appellate court will defer to the trial court's findings of fact 'unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' " *Nat'l City Bank. v. Plechaty* (*In re Plechaty*), 213 B.R. 119, 121 (B.A.P. 6th Cir. 1997) (citing Fed. R. Bankr. P. 7052; Fed. R. Civ. P. 52(a)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 573-74, 105 S. Ct. at 1511.

**FACTS**

Carl Mace and Cindy Mace (collectively "Debtors")[1] filed their Chapter 13 petition for bankruptcy relief on July 30, 2010. The Debtors listed Timothy Kelly and Sharon Kelly (collectively "Kellys")[2] on schedule F of their petition with an unsecured claim resulting from a civil suit. The Debtors listed the claim as "disputed" and represented that the amount of the claim was "unknown."

---

[1] Carl Mace individually will be referred to as "Mace."

[2] Timothy Kelly individually will be referred to as "Kelly."

On October 21, 2010, the Kellys filed an unsecured proof of claim in the Debtors' case in the amount of $313,781.36 (Proof of Claim No. 13-1). As the basis for the claim, the Kellys listed "promise to assume guarantee liability on FNB note." (*Id.*). The Kellys did not include any documents to support their claim.

On May 26, 2011, the Debtors filed an objection denying any and all liability to the Kellys on their claim and arguing that "[t]he claim is not supported by a statement of facts or other documents to support the basis of the claim." (Docket No. 114, Amended Obj. to Proof of Claim at 1-2). The Debtors requested that the bankruptcy court find "that because of the sparse and speculative nature of the claim, it shall not be entitled to prima facie validity" and therefore, the Kellys bear the burden of proving the legitimacy of their claim by a preponderance of the evidence. (*Id.*).

On June 22, 2011, the Kellys filed a response to the Debtors' objection to claim and attached two documents in support of their claim: (1) A letter from FNB dated April 21, 2008, notifying the Kellys that the FNB note matured and was due in full, and the bank would initiate legal proceedings against them as guarantors if a plan for payment was not put in place by April 30, 2011; and (2) A deposition transcript wherein the Kellys allege Mace acknowledged his promise to release the Kellys as guarantors on the FNB note. (Docket No. 117, Resp. to Amended Obj. to Proof of Claim).

On May 29, 2012, the bankruptcy court conducted an evidentiary hearing on the Debtors' objection to the Kellys' claim. On June 15, 2012, the bankruptcy court issued a Memorandum Opinion and entered an order overruling the Objection to Claim and allowing the Kellys' unsecured claim in full (Docket No. 152, Memo. Op.). In issuing its opinion, the bankruptcy court framed the only issue in the case as follows: "[W]hether there is sufficient evidence to support the existence of the alleged oral agreement." (*Id.* at 10). After hearing the testimony of Carl Mace, Timothy Kelly, Thomas Skelton and reviewing the documentary evidence submitted by the parties, the bankruptcy court determined that the evidence supported the Kellys' argument that the oral agreement did exist, that it was enforceable, and that Mace had breached it. The court allowed the Kellys' claim in the amount of $313,781.36. The Debtors filed a timely notice of appeal on June 29, 2012.

The dispute in this case centers around a corporation known as K&M Feeds, Inc. ("K&M"), and debts associated therewith. In December 1995, Kelly and Mace formed K&M for the purpose of operating a hardware and livestock feed store in Pennsylvania. Both of them owned a one-half interest in K&M with Mace serving as K&M's president and Kelly serving as secretary and treasurer. In late 1997, Kelly took over responsibility for the day-to-day operations at K&M's store for which he was paid a salary. Kelly stayed in that position until May 2004.

In 1998, K&M entered into a loan agreement with First National Bank of Slippery Rock ("FNB") ("1998 Loan"). The Debtors, the Kellys, K&M, and a K&M employee, Dan Travolini, were obligated on that loan. As collateral for the 1998 Loan, Mace pledged his home and farm in Ohio and executed a personal guaranty. Kelly and Dan Travolini also personally guaranteed the loan. None of the parties indicated how much K&M borrowed from FNB under the 1998 Loan.

Some time after the 1998 Loan was executed, the Debtors and the Kellys entered into an agreement titled "One Year Agreement." (Docket No. 126-1, Exhibit 1 to Memo. in Support of Debtors' Obj. to Proof of Claim). The agreement provided as follows:

1.    K&M agree [sic] that all stock in K&M Feeds, Inc. should be transferred to Carl V. Mace.

2.    K&M agrees to execute a Promissory Judgment Note to Timothy S. Kelly and Sharon L. Kelly, his wife [sic] in the amount of $40,000.00. In the event of the sale of K&M, Timothy S. Kelly and Sharon L. Kelly, his wife [sic] shall be reimbursed [sic] the sum of $40,000.00 to carry out the terms of the Promissory Judgment Note.

3.    Timothy S. Kelly and Sharon L. Kelly, his wife [sic] shall be authorized to purchase all outstanding shares of K&M for the sum of $40,000.00. The parties agree that the buy-out shall be re-evaluated and reviewed yearly and a written document acknowledged [sic] by K&M and Mace based on the equity of the business. Real estate owned by Carl V. Mace in Ohio shall be released from the business debt at the time of this transfer.

4.    In the event of the death of Carl V. Mace the parties agree that all outstanding shares of K&M shall be transferred to Timothy S. Kelly. It is agreed that the estate of Carl V. Mace shall finance K&M Feeds, Inc., but no transfer of stock shall occur until the outstanding debt owed by Timothy S. Kelly and

5

> Sharon L. Kelly is paid in full.  Stock shall be transferred only in conjunction with or subsequent to the release of Ohio real estate owned by Carl V. Mace from the business debt and loan.
>
> 5.  In the event of a buy out offer K&M shall not be sold unless Timothy S. Kelly gives approval of the buyout.

(*Id*. at 1-2).  Mace testified that the statement in paragraph 3 providing for the release of his property as collateral for the 1998 Loan was included because "[t]he initial part of the buyout was to have my property released, to get forty thousand dollars ($40,000) and to pay off any other existing vendor debt."  (Docket No. 163, Tr. of Hr'g, p. 74).

Mace testified that the purpose of the One Year Agreement was to transfer all ownership of K&M's stock to him so he could attempt to sell the business.  (*Id.* at 72).  Although Kelly admitted that Mace did want to sell K&M, he also claimed that Mace needed "some form of paperwork for a Sky Bank loan that he had entered into."  (*Id.* at 18).  According to Kelly's testimony, Mace needed something on paper which indicated he owned K&M outright before he could obtain a loan from Sky Bank.  (*Id.* at 19).  Mace testified that he did not have a loan with Sky Bank at the time the One Year Agreement was executed, but that he subsequently obtained one in August 2002.  Mace testified that the purpose of the Sky Bank loan was to pay off over $250,000 in vendor debt Kelly had allegedly incurred while in charge of operations at K&M.  (*Id*. at 73).

Although the One Year Agreement was dated January 1, 2002, it is undisputed that the agreement was not signed on that date.  Rather, it was signed at a later time and then backdated with everyone's consent to January 1, 2002. Mace claims that it was signed "a couple days" after January 1, 2002.  (*Id.* at 73).  Kelly claims that the One Year Agreement was not signed until sometime between October and December 2002.  (*Id.* at 14).   In support of this claim, the Kellys submitted a copy of an October 23, 2002 letter from K&M's attorney, Robert Clark.  The letter was addressed to the Kellys and the Debtors and stated "Please find enclosed a new draft of the Agreement and Promissory Judgment Note. . . . [W]e need to move forward by making arrangements to have them signed and have the stock transferred to Carl and Cindy."  (Docket No. 136-2, Exhibit 1, Kellys' Reply Br. to Debtor's Amended Obj. To Proof of Claim).

6

The Promissory Judgment Note provided for in the One Year Agreement states that "K & M Feeds, Inc., by Carl V. Mace . . . promises to pay to the order of Timothy S. Kelly and Sharon L. Kelly . . . Forty ($40,000) Thousand at zero (0%) percent interest per annum." (Docket No. 126-3, Exhibit 3 to Memo. in Support of Debtors' Objection to Proof of Claim). Pursuant to its terms, the note matured on May 1, 2008. Although the note is also dated January 1, 2002, the parties agree it was backdated with everyone's consent. Both Kelly and Mace agree that the Promissory Judgment Note was not executed until April or May 2004.

The transfer of Kelly's stock in K&M was accomplished by Kelly's assignment of his shares on the back of the stock certificate. The assignment provides that "for value received, I hereby sell, assign and transfer unto Carl V. Mace shares represented by the within Certificate . . . ." (Docket No. 126-2, Exhibit 2 to Memo. in Support of Debtors' Obj. to Proof of Claim). Although the assignment indicates it was signed on January 1, 2002, the parties admit that it was consensually backdated. The parties do not agree, however, as to when the stock transfer took place. Kelly claims that he did not transfer the stock until April or May 2004. (Docket No. 163, Tr. of Hr'g, pp. 12, 49, 74). Mace claims that Kelly transferred the stock in early January 2002. (*Id.* at 74-75). Despite his contention that he did not transfer the stock until the spring of 2004, Kelly stopped reporting any capital gains or losses from the stock on his tax returns after 2001. (*Id.* at 13-14).

In late 2001 or early 2002, Kelly and Mace met with Thomas Skelton who owned a business adjacent to K&M. The three met and discussed the possibility of Skelton coming into K&M as a one-third owner; however, Skelton was never made a one-third owner of K&M. Instead, through the efforts of Kelly and Skelton, K&M refinanced the 1998 Loan with FNB, allegedly in anticipation of Kelly and Skelton purchasing Mace's interest in K&M. Mace was not involved in the negotiations for this loan. (*Id.* at 22). The loan was executed on May 24, 2002 ("2002 Loan"). The principal amount of the loan was $347,000. The loan documents indicate that the purpose of the loan was "for business use to refinance existing debt." (Docket No. 126-4, Exhibit 4 to Memo. in Support of Debtors' Obj. to Proof of Claim). According to the loan's terms, K&M was to make monthly payments of $3,130 for 60 months, with a balloon payment due at maturity in May 2007.

7

Testimony given by Mace indicates that K&M made all monthly payments on the 2002 Loan with FNB until the Note came due in May of 2007.

Pursuant to the terms of the 2002 Loan, FNB released Mace's real property in Ohio as collateral. FNB also released Mace and Dan Travolini from their personal guaranties for the loan. The Kellys and the Skeltons became the new guarantors of the loan and they pledged the Skeltons' farm as collateral. At no point in time did Mace or Kelly transfer any K&M stock to Skelton and Skelton never had any formal ownership interest in the company. Despite this fact, Skelton signed the 2002 Loan as "Secretary/Treasurer" of K&M. Kelly signed the 2002 Loan as "President" of K&M. (*Id*.). On cross examination, Kelly admitted that there was no formal corporate resolution providing for these changes in K&M ownership, but he contended that he and Mace orally agreed to make Kelly president and Skelton secretary/treasurer for the limited purpose of executing the 2002 Loan documents. (Docket No. 163, Tr. of Hr'g, pp. 34-35). Mace disputed this allegation and testified that he did not recall ever giving Kelly or Skelton authority to act as president or secretary/treasurer, respectively, for any purpose. (*Id*. at 78).

As stated *supra*, the parties disagree about the timing of Kelly's transfer of his K&M stock. Mace contends it was transferred in January 2002, while Kelly asserts the transfer did not occur until sometime in 2004. Although the One Year Agreement provided for the transfer of Kelly's stock in exchange for the Promissory Judgment Note, Kelly testified that there was additional consideration for the transfer: Mace's oral promise to release the Kellys from their personal liability on the FNB debt. (*Id.* at 51). Mace vigorously disputes this contention and asserts that his offer to try and get the Kellys released from their personal liability was not made in exchange for the transfer of Kelly's K&M stock. (*Id*. at 76). Mace also testified that his offer was not an absolute guarantee that he would in fact obtain a release of the Kellys' liability:

> A.   Well, I can't remember guaranteeing anything. I cannot guarantee what the bank does. The bank has their own mind. They'll do what they want to do.
>
> Q.   Did you make any statement to Mr. Kelly that you would release him from the loan obligation?

A. I didn't, and I did follow up on that. I made a request to – which was documented in here–to First National Bank, then of Slippery Rock, to have both Tom and Tim released as guarantees [sic].

Q. So you agreed with Mr. Kelly that you would have him released?

A. I would try at that point, yes.

(*Id.* at 76). Kelly contends that an attorney drafted an agreement committing Mace's oral promise to writing. (*Id.* at 136-37). An unsigned copy of this document was submitted as an exhibit during the bankruptcy court hearing ("Draft Agreement"). The Draft Agreement states in relevant part: *"Mace and K & M agree to release Kelly* from any and all outstanding notes, mortgages, or liens that they may have personally signed for on behalf of K & M.[3] Said release shall occur in writing regarding all documents on or before December 31, 2004." (Docket No. 136-3, Exhibit B to Kellys' Reply Br. to Debtor's Amended Obj. to Proof of Claim) (emphasis added). The Draft Agreement is attached to a letter dated March 11, 2004, addressed to the Kellys and the Debtors. The letter provides "Please find enclosed a draft of a simple agreement, which I have prepared along with a copy of a Promissory Judgment Note based on recent conversations that I have had with Tim." (*Id.*). The promissory judgment note referenced in the Draft Agreement is not included in the record.

In April or May 2004, the Draft Agreement was revised ("Revised Agreement") ( Docket No. 136-4, Exhibit C to Kellys' Reply Br. to Debtor's Amended Obj. to Proof of Claim). The Revised Agreement calls for a payment schedule to pay $40,000 on the following terms:

> K & M agrees to execute a Promissory Judgment Note payable to Kelly in the amount of forty thousand dollars ($40,000.00), the terms of which shall be no interest with a payment of $10,000.00 on or before December 31, 2004 and an additional sum of $10,000.00 on or before September 30, 2005 and a final payment of $20,000.00 on or before May 1, 2008.

(*Id.*). The Revised Agreement also includes language to reflect a mutual release: "Mace and K & M agree to a complete release of Kelly . . . Likewise, Kelly grants a complete release of Mace and

---

[3] When using the singular "Kelly," the Agreement is referring to both Timothy and Sharon Kelly. When using the singular "Mace," the Agreement is referring to both Carl and Cindy Mace. *See* Docket No. 136, Exhibit B to Kellys' Reply Br. to Debtor's Amended Obj. to Proof of Claim.

K & M . . . ." (*Id*.). An additional provision in the contract provides that "it is a *requirement* of this agreement *that First National Bank of Slippery Rock release Kelly*." *Id*. (emphasis added). The Revised Agreement was never signed and there is no evidence in the record to support that Mace, either individually or as a representative of K&M, ever signed that version of the Promissory Judgment Note.

Throughout the next several years, Mace met with several banks in an attempt to refinance the K&M debt. (Docket No. 163, Tr. of Hr'g, pp. 94-99). He initially attempted to try to substitute himself as guarantor on the 2002 Loan that the Kellys had obtained from FNB. In a letter written by a commercial loan officer at FNB on April 30, 2004, the bank informed Mace that it would be unable to grant his request for a release:

> I am sorry to inform you that your request to release Tim & Sharon Kelly, and Tom & Amy Skelton as guarantors for the loan of K & M Feeds, Inc. to The First National Bank of Slippery Rock, and you replacing them with your guaranty has been denied.
>
> We think that a complete refinance of the business debt with another lender is in your best interest and the interest of this bank at this time. It will serve to release the other parties that have requested they be released from their guarantees.

(Docket No. 136-5, Exhibit D to Kellys' Reply Br. to Debtor's Amended Obj. to Proof of Claim). The Kellys and the Skeltons received a copy of this letter.

Despite receiving this letter in April 2004, Kelly did not become concerned about the possibility that Mace would have difficulty in satisfying his promise to be substituted for the Kellys as a guarantor or to obtain a release of the Kellys' guaranty obligations to FNB. Nor did Kelly do anything to stop the transfer of his K&M Stock to Mace based on FNB's refusal to release him from his guaranty.

> Q.    Okay. So you knew in late April 2004 that [Mace] had requested that you be released and that request had been denied; isn't that correct?
>
> A.    I did.
>
> . . . .

10

Q.	So you knew before you transferred [Mace] the stock that he had already asked that you be released and the bank had denied it?

A.	I did know that, yes.

Q.	Well, weren't you a little concerned that Mr. Mace wouldn't be able to get you off since he had already asked to have you relieved from this debt obligations and the bank had denied it?

A.	I was not concerned that he would eventually be able to do–to get it taken off. I did not know when that could happen, but I knew when it had to happen by.

Q.	And when was that?

A.	The maturity of the note.

. . . .

Q.	Well, isn't it true that it's the bank who decides who was going to be obligated on this loan and who was not going to be obligated on this loan?

A.	I would assume the bank ultimately has final say as to whether they accept or reject, any bank.

Q.	And isn't it true that the only thing Carl could do is request and offer himself as a guarantor?

A.	I don't know completely what all Carl's means were. To say that's all he could do, I don't know the answer to that. Those were two things he certainly could do.

Q.	Well, what did you do to insure that Mr. Mace was going to hold up his bargain, his end of the agreement here?

A.	There wasn't really anything I could do. Up to that point, Carl had always done what he said he was going to do.

Q.	Well you could have hold [sic] onto the stock, couldn't you?

A.	I could have.

Q.	And you didn't do that?

A.	I did not.

Q.	You transferred him the stock?

A.	That's right.

(Docket No. 163, Tr. of Hr'g, pp. 52-55).

11

Kelly also testified that he made little effort to check on Mace's progress on his promise over the next several years.

Q.     Did you ever contact Carl about what he was doing to get you off the loan?

A.     No.  I did not.

Q.     Did you ever contact the bank and find out whether or not you were released from the loan?

A.     I did not.

Q.     Did you ever discuss with Mr. Skelton whether or not you were off the loan?

A.     I kept track of [Skelton] and [Mace's] efforts, yes.

Q.     How did you do that?

A.     By talking to Tom [Skelton]

. . . .

Q.     So during the period between '04 and '07, '08, you were in contact with Mr. Skelton about the efforts to refinance this loan?

A.     Every once in a while, yes.

Q.     Well, you recall I took your deposition?

A.     I do.

Q.     And you recall I asked you a similar question?

A.     I don't recall that.

Q.     Well, let me refresh your memory here. . . .

> Question: did you ever talk to Mr. Skelton to have that loan refinanced?
>
> Answer: Mr. Skelton and I had some conversations as to how it was going to be –going to seek refinancing. Beyond that, no
>
> Question: Tell me about your discussions with Mr. Skelton
>
> Answer: What do you mean?
>
> Question: Well, you just told me that you had discussions with Mr. Skelton regarding refinancing. Tell me what was the – what was discussed.

> Answer: I would ask him whether–how things were coming. And this is after we received notice of the default.
>
> Question: So you did nothing from May 2004 until you were notified of the default?
>
> Answer: That's correct
>
> Question: That was what, sometime in '08?
>
> Answer: That's right

Q. So your testimony during the deposition, you had no discussions with Mr. Skelton until after you were notified of the default in 2008. Now, you're telling the Court that you had some discussions before that time.

A. I'm not quite sure on what you've read that I indicated that I had no discussions with [Skelton]. [Skelton] and I are friends. We would talk about many things at different times. And I might make the comment, hey, you know, Carl doing anything about the loan? But to be quite honest, I never did press it very much because I also knew that it was Tom's property that was basically on the line. And if anybody was going to put pressure on Carl to get it done, it would be Tom.

Q. So you weren't concerned because your property wasn't at stake?

A. I was concerned. . . . I just knew I really had no leverage. There wasn't anything I could do. I was at the mercy of Carl doing what he said he would do.

(*Id.* at 55-58).

Insofar as Kelly's efforts to keep in touch with FNB, there were none.

Q. Did you keep in touch with the bank regarding who was obligated on the loan?

A. No.

(*Id.* at 58). Although Kelly became "very concerned" after receiving a letter from FNB on November 17, 2006, in which FNB indicated the loan was still pending, he still did not contact FNB or Mace. (*Id.* at 64).

Q. Did anything happen between May 2004, April or May 2004, when you said you had this agreement with Mr. Mace, and May of 2008 that caused you to

> believe that Mr. Mace had, in fact, released you–released your obligation to First National Bank of Slippery Rock?
>
> A.    Nothing happened.  I made a naive assumption that when the maturity date came and went and I got no notification from the bank that the loan had been refinanced.
>
> Q.    And, of course, you made no attempt to refinance the loan yourself?
>
> A.    That's correct.

(*Id.* at 65).    Kelly did not even respond to requests from FNB to provide updated financial information with respect to the 2002 Loan.  (*Id.* at 61).

During his testimony, Mace maintained that Kelly refused to talk to him after leaving K&M in 2004.  (*Id.* at 99).

On April 21, 2008, FNB advised the Kellys that the 2002 Loan was in default and that the bank intended to initiate legal proceedings against the maker and guarantors.  The Kellys contend this is when they first learned of Mace's breach of his oral agreement toassumeguaranty liability for the 2002 Loan or procure FNB's release of the Kellys from their guaranty.

The Kellys commenced a collection action on the $40,000 Promissory Judgment Note in Pennsylvania state court against Mace sometime after May 2008.  Mace's deposition was taken in connection with this lawsuit on September 5, 2008.  During the deposition, Mace testified that he would obtain a release of the Kellys' liability as guarantors of the FNB note by September 30, 2008.  However, Mace testified at the bankruptcy court hearing that at the time the deposition was taken in September 2008 "we had a pending approval on a loan, yes.  And if the loan would have been approved, that would have happened." (*Id.* at 94).  At some point between September and November 2008 Mace was notified that the loan he had attempted to take out to refinance the Kellys' and the Skeltons' liability to FNB had been denied.

On November 3, 2008, FNB filed a foreclosure action against the Skelton farm in the Mahoning County Court of Common Pleas ("Foreclosure Action") (Case No. 2008 CV 4321).  On April 14, 2009, the Skeltons filed an answer.  The Skeltons also filed a third-party complaint against

Mace in the Foreclosure Action. Mace was granted leave until May 10, 2010, to file his answer, but failed to do so.

On December 1, 2008, FNB filed a complaint against the Kellys in which it alleged that the Kellys were in default under the guaranty on the 2002 Loan. On August 11, 2011, the state court issued a final judgment in favor of FNB in the amount of $338,988.12, plus interest and attorney fees.

On July 30, 2010, the Debtors filed for bankruptcy under Chapter 13 of the Bankruptcy Code.

**DISCUSSION**

The procedural posture of the matter which gives rise to this appeal is Debtors' objection to an unsecured claim filed by the Kellys in the amount of $313,781.36. At the evidentiary hearing, the bankruptcy court focused solely on the issue of whether Mace made an oral agreement to release the Kellys from their liability as guarantors on the 2002 Loan that K&M obtained from FNB. At the end of the evidentiary hearing, the bankruptcy court concluded that there was an oral agreement between Mace and Kelly and that Mace had breached that oral agreement. Without any discussion as to how that breach gave rise to a claim in the amount of $313,781.36, the court overruled the Debtors' objection to the claim finding that the Debtors had failed to rebut the prima facie validity of the claim.

As will be further discussed below, a claim is only afforded prima facie validity if the claimant alleges facts sufficient to support a legal liability to the claimant. Even if the facts support the Kellys' argument that Mace made a promise to try to substitute himself as guarantor for the 2002 Loan or obtain a release of the Kellys' guaranty, the Kellys do not have a claim unless Mace's promise created a legal liability to the Kellys. Thus, there are two issues before the Panel on appeal: (1) Whether the bankruptcy court erred in finding Mace made an enforceable oral agreement with the Kellys to release them from liability as guarantors on the 2002 Loan; and (2) Assuming the facts support a finding there was an oral agreement, did the bankruptcy court err in finding that the oral agreement gave rise to a legal liability for damages?

15

I.     **The Enforceability of Oral Agreements Under Pennsylvania Law**

The Panel will first address whether the bankruptcy court erred in finding a contractually binding agreement between Mace and the Kellys by which Mace agreed to release the Kellys from their liability on the Kellys' guaranty obligation of funds borrowed by K&M in 2002. The validity of a contract, written or oral, is determined by law of the state in which it was executed "absent a contrary intent." *Curtis 1000, Inc. v. Martin*, 197 Fed. Appx. 412, 418 (6th Cir. 2006) (citation omitted). K&M was incorporated in Pennsylvania and all alleged contracts, oral and written, were executed by the parties in Pennsylvania. The parties have not indicated an intent to apply the law of another jurisdiction. Thus, Pennsylvania contract law applies.[4] The party alleging a claim for breach of contract must establish: "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract and (3) resultant damages." *QVC, Inc. v. MJC Am., Ltd.*, 904 F. Supp. 2d 466 (E.D. Pa. 2012) (citing *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225-26 (3d Cir. 2003), (quoting *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

When alleging a breach of an oral contract, the burden of proving the existence of the contract is on the plaintiff. *Taylor v. Creditel Corp.,* No. Civ.A. 04-CV-2702, 2004 WL 2884208, *6 (E.D. Pa. Dec. 13, 2004), *see also Mackay v. Mackay,* 984 A.2d 529, 534 (Pa. Super. Ct. 2009) (where "a party seeks to enforce a disputed oral agreement, it is incumbent upon that party to establish the essential terms and conditions that constitute the enforceable agreement."). Some courts have held that "the evidence supporting the existence of such an oral contract must be 'clear and precise.' " *Luther v. Kia Motors Am.*, *Inc.*, 676 F. Supp. 2d 408, 416 (W.D. Pa. 2009) (citing *Martin v. Safeguard Scientifics,* Inc., 17 F. Supp. 2d 357, 368 (E.D. Pa. 1998); *See also Redick v. Kraft, Inc.*, 745 F. Supp. 296, 300 (E.D. Pa. 1990). Other courts have concluded that the lower standard, preponderance of the evidence, is sufficient to establish the existence of a contract. *See Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*, No. CIV. A. 95-1376, 1998 WL 721081, *13

---

[4] Although the bankruptcy court does not directly discuss Pennsylvania law in its analysis of whether there was an oral contract, the bankruptcy court does cite to Pennsylvania law in its analysis of the statute of limitations issue.

(E.D. Pa. Oct. 14, 1998) (holding that an oral contract must be proven by preponderance of evidence and rejecting the contention that clear and convincing evidence is required); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 862 F.Supp. 1361, 1365 n.6 (E.D. Pa. 1994), *aff'd in part and vacated in part on other grounds*, 63 F.3d 1267 (3d Cir. 1995), *cert. denied*, 516 U.S. 1172, 116 S. Ct. 1264 (1996); *Pinizzotto v. Parsons Brinkerhoff Quade & Douglas*, *Inc.,* 697 F. Supp. 886, 888 (E.D. Pa. 1988) (rejecting higher burden of proof and upholding finding of oral contract from preponderance of evidence). Although the Pennsylvania Supreme Court has not decided which burden of proof standard applies in order to establish the existence of a contract, a majority of decisions apply the higher "clear and precise" standard. *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012).

In order to establish the existence of a contract, Pennsylvania law requires a plaintiff to show: "(1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms [to be enforced], and (3) an agreement supported by adequate consideration."[5] *Id*. (citation omitted). The questions of whether a contract exists and "the issues of what was said, done, and agreed upon by the parties are ones of fact to be determined by the fact finder." *Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 783 (Pa. Super. 2006) (citing *Yaros v. Trustees of the Univ. of Pa.*, 742 A.2d 1118, 1122 (Pa. Super. 1999)). "Clarity is particularly important where an oral contract is alleged." *Pennsy Supply, Inc. v. Am. Ash Recylcing Corp. of Pa.*, 895 A.2d 595, 600 (Pa. Super. 2006) (citation omitted). When oral contracts are disputed, "[u]nambiguous terms of a contract are construed by a court as a matter of law." *Lapio v. Robbins,* 729 A.2d 1229, 1232 (Pa. Super. 1999) (citation omitted).

The first element, mutual intent to be bound by an agreement, usually manifests as " 'an offer or proposal by one party followed by an acceptance by the other party or parties.' " *Bayliss-Allen v. Cadence Design Sys., Inc.*, No. 99-CV-3240, 2000 WL 1156857, *4 (E.D. Pa. Aug. 16, 2000) (citing Restatement (Second) of Contracts § 22(1) (1981)). The question of the intent of the parties is an issue of fact reserved for the fact finder. *Krebs*, 893 A.2d at 783. In order to determine whether the

---

[5] The bankruptcy court does not cite to or address the first two elements of an enforceable contract under Pennsylvania law.

17

parties intended to be bound by the terms of the agreement, the focus of the inquiry is "the intent a reasonable person would apprehend in considering the parties' behavior," rather than the subjective intent of the parties. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (citation omitted). "In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." *Mountain Props., Inc. v. Tyler Hill Realty Corp.,* 767 A.2d 1096, 1101 (Pa. Super. 2001) (internal quotation marks omitted).

The second element requires proof that the terms of the agreement be sufficiently defined. Pennsylvania has adopted the Restatement (Second) of Contracts, which states:

> (1) Even though a manifestation of intention is intended as an offer it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that the manifestation of intention is not intended to be understood as an offer and acceptance.

Restatement (Second) of Contracts § 33 (1981). "Incompleteness of terms is one of the primary reasons statements of preliminary negotiation are not deemed offers." *Reed v. Pittsburgh Bd. of Pub. Educ.*, 862 A.2d 131, 135 (Pa. Commw. 2004) (citing Restatement (Second) of Contracts § 33 cmt. c (1979)).

Finally, the requirement of consideration is satisfied if there was a benefit conferred on the promisor or a detriment to the promisee and " 'an act, forbearance or return promise bargained for and given in exchange for the original promise.' " *York Excavating Co. v. Employers Ins. of Wausau*, 834 F. Supp. 733, 740 (M.D. Pa. 1993) (citation omitted).

18

In reviewing the record, the Panel concludes that under either the more heightened "clear and precise" standard, or the lower preponderance of the evidence standard, the bankruptcy court erred in finding that the Kellys had established there was an enforceable oral contract between the parties.

The first requirement for an enforceable oral contract is that the party seeking to enforce the agreement must demonstrate that both parties intended to be bound by the agreement. The evidence supports the trial court's conclusion that Mace made a promise to try to substitute himself as a guarantor on the liability to FNB Bank guaranteed by the Kellys. On at least two separate occasions, Mace attempted to either substitute himself as a guarantor of the debt, or to obtain refinancing of the debt owed by K & M to FNB Bank. In April, 2004, Mace went to FNB Bank and requested that he be substituted as a guarantor of the 2002 Loan obtained by K & M. The bank responded as follows:

> I am sorry to inform you that your request to release Tim & Sharon Kelly, and Tom & Amy Skelton as guarantors for the loan of K & M Feeds, Inc. to The First National Bank of Slippery Rock, and you replacing them with your guaranty has been denied.
>
> We think that a complete refinance of the business debt with another lender is in your best interest and the interest of this bank at this time. It will serve to release the other parties that have requested they be released from their guarantees.

After FNB refused to substitute Mace as a guarantor, the record also shows that in 2008, Mace attempted to obtain a loan elsewhere to refinance the debt guaranteed by Kelly. However, the financing fell through and Mace never received a loan. (Docket No. 163, Tr. of Hr'g, pp. 94-95, 97-99). K&M continued to make the payments on the 2002 Loan to FNB until 2007 when the loan went into default.

The record is clear that Mace made a promise to Kelly to have the guaranty released. The record is equally clear that Kelly "agreed" with Mace's offer. After FNB's rejection of Mace's offer to substitute himself as guarantor, Kelly did nothing to attempt to refinance the debt. Even after Kelly was notified of the default on the 2002 Loan, Kelly made no attempt to refinance the loan. Until April 21, 2008, when FNB advised the Kellys that the bank intended to initiate legal proceedings against them as guarantors of the 2002 Loan, it is clear that Kelly believed Mace would

19

be able to refinance the 2002 Loan. The parties were in "agreement" that Mace would try to substitute himself as a guarantor on the debt or refinance the loan.

Even if the bankruptcy court determined that there was an "agreement" that Mace would try to substitute himself as a guarantor, this Panel finds that such an agreement would not give rise to an enforceable contract. The problem with this kind of "agreement" is that while there might have been the requisite intent, the parties could not be bound by this agreement because it was an agreement which required the consent of a third party. In order to be substituted as a guarantor, Mace had to have the approval of FNB Bank. Mace had no power or authority to release the Kellys' guaranty; only FNB could elect to release it. In order to refinance the 2002 Loan from FNB, Mace had to convince a bank to give him or K&M, sufficient funds to refinance the 2002 Loan An agreement which is contingent on acts which must be performed by a third party is not an enforceable oral agreement. *See Bennet v. Itochu Int'l Inc.,* Nos. 09-CV-1819, 09-CV-4123, 2012 WL 3627404 \*19 (E.D. Pa. Aug. 23, 2012) (on a motion for summary judgment, court rejected claim for breach of contract finding that where the terms of a contract included formal approval by a committee, "no reasonable juror could extract from this a mutual intent to be bound prior to the completion of the necessary approval process.").

Moreover, there is no meeting of the minds. *See Rich v. G.W. Pifer Sons*, 100 Pa. Super. 483, 487 (1930) (holding that "[s]o long as any condition is not acceded to by both parties to the contract, the dealings are mere negotiations and may be terminated at any time by either party while they are pending. There must be a meeting of minds in order to constitute a contract."); *In re Whatever, LLC*, 478 B.R. 700 (Bankr. W.D. Pa. 2012) (court held there was no mutual assent or meeting of the minds where offers by lendor's attorney of a discounted payoff amount were conditioned on approval by a loan committee, and such approval was never obtained). The Kellys could not have sued Mace in state court to compel him to try to substitute himself as the guarantor or refinance the debt. Therefore, there was simply no ability for Mace and Kelly to be bound by this oral promise. Since the parties could not be bound by the oral promise, there was no enforceable oral agreement.

The second element of a binding oral agreement is that the terms of that agreement must be sufficiently definite to be enforced. The bankruptcy court erred as a matter of law in concluding that

Mace's promise to try to substitute himself as a guarantor had sufficiently definite terms to create an enforceable obligation between the Kellys and Mace. It is clear from the testimony that Mace and Kelly had very different interpretations of Mace's promise. Mace testified he had promised to try to substitute himself as a guarantor or attempt to refinance the debt. Kelly, at least with the benefit of hindsight, interpreted this promise as a promise to hold the Kellys harmless if FNB sued them because of their guaranty of the 2002 Loan. While this may have been Kelly's subjective belief, there is nothing in the record to support the conclusion that the parties had agreed to such terms. In fact, the evidence is to the contrary. In 2004, an attorney drafted an agreement to be signed by Mace and the Kellys regarding their mutual obligations. The Draft Agreement stated in relevant part, "Mace and K&M agree to release Kelly from any and all notes, mortgage or liens that he may have personally signed for on behalf of K&M. Such relief shall occur in writing regarding all documents on or before December 31, 2004." (Docket No. 136-3, Exhibit B to Kellys' Reply Br. to Debtor's Amended Obj. to Proof of Claim). The Draft Agreement was later revised, but the Revised Agreement was never signed, and Mace vigorously disputes that he ever orally promised to hold the Kellys harmless if FNB sought to enforce its guaranty against the Kellys. Without any evidence in the record to support Kelly's interpretation of Mace's promise, the bankruptcy court erred in concluding that there was an agreement on the terms of the promise. Mace certainly hoped that he would be able to refinance the debt, but he never committed to indemnify the Kellys in the event Mace could not obtain refinancing. While the Kellys' belief that Mace could refinance the debt may have been heartfelt, there is nothing in the record to support that Mace and the Kellys had agreed that Mace would be contractually bound to indemnify the Kellys in the event they were sued on the guaranty.[6]

---

[6]If Mace promised to indemnify the Kellys, such an agreement may nonetheless be unenforceable under the statute of frauds. In Pennsylvania, the Statute of Frauds is codified at 33 P.S. § 3. The Statute of Frauds provides:

> No action shall be brought whereby to charge any executor or administrator, upon any promise to answer damages out of his own estate, or whereby to charge the defendant, upon any special promise, to answer for the debt or default of another, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him authorized.

This Panel finds that the court erred in concluding that the fact that Mace agreed to try to substitute himself as guarantor or to try refinance the loan, gave rise to an enforceable oral contract between Mace and the Kellys.

II.        **Requirements to Establish Prima Facie Validity of Claim**

A prerequisite to finding that a claimant has met his burden of establishing the prima facie validity of a claim, is that the claimant must allege facts sufficient to support a legal liability to the claimant. The second question before this Panel is whether the bankruptcy court erred in finding that the Kellys alleged facts sufficient to hold Mace legally liable on his promise to the Kellys, and therefore provide a basis for the Kellys' claim in Debtors' bankruptcy case.

On October 10, 2010, the Kellys filed an unsecured proof of claim in the Debtors' case in the amount $313,718.36. As the basis for the claim, the Kellys listed "promise to assume guaranty liability on FNB note."

11 U.S.C. § 101(5) defines a claim as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

A creditor, an indenture trustee, or an equity security holder may file a proof of claim. 11 U.S.C. § 501(a). A proof of claim that "allege[s] facts sufficient to support a legal liability to the claimant," is considered "prima facie evidence of the validity and amount of the claim." *See* Federal Rule of Bankruptcy Procedure 3001(c) and (d); *see also*, *Normali v. O'Donnell (In re O'Donnell)*, Nos. 04-8054, 04-8056, 2005 WL 1279268, *4 (B.A.P. 6th Cir. May 19, 2005) (table); *In re*

_____

33 P.S. §3. (Act of April 26, 1855, P.L. 308 § 1); *Kowalewski v. Whittington*, No. 2003 CV 2991, 2005 WL 1595432 (Pa. Com. Pl. 2005). The statute of frauds rule that a promise to answer for the debt of another must be in writing, however, does not apply if the main object of the promisor is to serve his own pecuniary or business purpose. *Biller v. Ziegler*, 593 A.2d 436 (Pa. Super. 1991).

*Hughes*, 313 B.R. 205, 208 (Bankr. E.D. Mich. 2004). A debtor may dispute the presumptive validity of a claim by filing an objection thereto. 11 U.S.C. § 502(a).

During the claims allowance process, the burden of proof rests on different parties at different times. *In re O'Donnell*, 2005 WL 1279268 at \*4. Initially, a creditor bears the burden of establishing its claim by filing a properly completed proof of claim. *See* Fed. R. Bankr. P. 3001(f). If a party objects to the claim, the objecting party carries the burden of going forward with evidence to overcome the *prima facie* validity and amount of the claim. If the objecting party produces evidence to rebut at least one of the allegations essential to the claim's legal sufficiency, the burden of persuasion shifts back to the claimant. *Id.* (quoting *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992)). The claimant ultimately bears the burden of proving the validity of the claim by a preponderance of the evidence. *Id.*

This Panel finds that the bankruptcy court erred in concluding that the facts testified to by Kelly were sufficient to hold Mace legally liable to the Kellys for $313,781.36. In 2008, Kelly did attempt to collect on a claim against Mace, that being a collection action on the $40,000.00 promissory note Mace had given to Kelly at the time Mace purchased Kelly's stock. However, prior to the filing of the bankruptcy case, Kelly never asserted that he had an enforceable claim against Mace in the amount of $313,781.36, the amount presumably owed by the Kellys to FNB. The Panel has already found that any oral agreement to procure a release of Kellys' guaranty is unenforceable. Moreover, in the absence of an indemnification agreement or some other type of agreement, the Kellys have presented no facts to support an argument that Mace should be held legally liable to the Kellys for $313,781.36. There is no evidence in the record that Mace ever agreed orally or in writing to hold the Kellys harmless if they were sued on their guaranty to FNB Bank. In the absence of such an indemnification or hold harmless agreement, the Kellys have failed to allege facts sufficient to establish the prima facie validity of a claim in the amount of $313,781.36.

## CONCLUSION

After reviewing the entire record, this Panel is left with the definite and firm conviction that a mistake has been committed by the bankruptcy court. Mace and Kelly both testified credibly that

23

Mace made an oral promise to try to substitute himself as a guarantor for the Kellys on the liability owed by them to FNB Bank. However, that promise created neither an enforceable oral contract, nor a valid bankruptcy claim for $313,781.36. The bankruptcy court's conclusion that the Kellys have an unsecured claim in the amount of $313,781.36 is clearly erroneous.

For the foregoing reasons, the bankruptcy court's order overruling the Debtors' objection to claim is reversed. This matter is remanded to the bankruptcy court for the entry of an order consistent with this opinion.